IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

Roanoke Division

ERIC DEPAOLA,

       Plaintiff,

v.                         CIVIL ACTION NO. 7:16-cv-00485

H. CLARKE, et al.,

       Defendants.

## AFFIDAVIT

State of Virginia, County of Wise, to-wit:

       AMEE DUNCAN, first being duly sworn, states as follows:

1.      I am a Unit Manager of C-Unit at Red Onion State Prison (ROSP).

2.      I base the information contained in this Affidavit on personal knowledge and records maintained in the regular and ordinary course of business.

3.      I have been advised of this lawsuit filed by offender Eric DePaola (#1145137). DePaola complains about the Virginia Department of Corrections grooming policy as it relates to beard length, as well as barber services at ROSP. I understand that DePaola also complains of his assignment within the Step Down Program at ROSP and television privileges.

4.     Offender DePaola is currently housed in C-Unit and I am very familiar with his current status.  I also served as DePaola's counselor prior to assuming my current role as Unit Manager.  DePaola is a Level "S" offender, which is a special purpose bed assignment used by ROSP for the protective care and custodial management of offenders.  He participates in the Step-Down Program at ROSP.

5.     Security Level "S" is comprised of three management pathways:  (1) Intensive Management (IM) Security Level "S," and (2) Special Management (SM) Security Level "S," or (3) the Re-entry Unit (offenders with 24 months or less remaining on their sentence).

6.     Offender DePaola is assigned to the IM Security pathway.  Offenders are assigned to the IM pathway if they have the potential for extreme and/or deadly violence.  They are reviewed and assigned to escalating privilege levels, and the various assignments are as follows:

> Intensive Management (IM):
> IM-0
> IM-1
> IM-2
> IM-SL6

7.     VDOC Operating Procedure (OP) 864.1, *Offender Grooming and Hygiene,* establishes uniform personal grooming standards for offenders incarcerated in the VDOC to facilitate the identification of offenders and promote

safety, security and sanitation.  All VDOC offenders are permitted to grow a beard that is ¼-inch maximum in length.  Offenders who violate this policy may be charged with Disciplinary Offense Code 133 (Refusal to Obey an Order), and placed in a segregation housing assignment.  A copy of OP 864.1 is attached as Enclosure __A__.

8.     Offenders in segregation are permitted to shower and shave not less than three times a week.  Barber services are offered monthly.  DePaola has been in compliance with the VDOC grooming standards and most recently received barber services on March 7, 2017.

9.     Offenders assigned to a segregated housing assignment are limited in their out-of-cell activities.  Although segregation offenders may not attend group religious services, they may practice their faith in their cells.  ROSP has a Chaplain on staff for all religious requests including religious materials and religious guidance.  Offenders assigned to a segregated housing assignment may request that the Chaplain visit their cell for private worship and counsel.  A copy of VDOC OP 841.3, *Offender Religious Programs*, is attached as Enclosure __B__.

10.     There are no "communal" televisions in the housing pods of C-Unit. There are incentives built into the Step-Down Program which we hope will motivate the offenders to participate and work toward long-term behavioral changes, new thought patterns and social skills.  Televisions are considered a

privilege.  If an offender participates in the Challenge Series by working to reach established goals and remain infraction free, he may be considered for a pod job which would enable him to earn money for a personal television.

11.    A review of our records indicates that DePaola's television was confiscated in November 2015, when he was reduced to IM-0 status.  However, it was returned to him on April 29, 2016, after reaching IM-1 status on April 28, 2016.

12.    Offender DePaola was most recently reviewed by the Institutional Classification Authority (ICA) on March 1, 2017.  It was noted that DePaola had completed the Challenge Series and the ICA recommended his continued assignment to segregation, IM-2 housing status, pending review by the Dual Treatment Team.  A copy of the ICA Hearing report and Notice is attached as Enclosure C.

AMEE DUNCAN

_____
Affiant

Sworn and subscribed to before me, a Notary Public, in and for the State of Virginia, County of Wise, this ___13th___ day of March 2017.

_____
Notary Public

My commission expires:     __1-31-2020_____

| | Effective Date | | Number |
|---|---|---|---|
| | August 1, 2016 | | 864.1 |
| **Operating Procedure** | **Amended** | | **Operating Level** |
| | 7/29/16 | | Department |
| | **Supersedes** | | |
| | Operating Procedure 864.1 (4/1/16) | | |
| | **Authority** | | |
| | COV §53.1-10; §53.1-23; §53.1-25 | | |

| **Subject** | **ACA/PREA Standards** |
|---|---|
| **OFFENDER GROOMING AND HYGIENE** | 4-4262, 4-4263, 4-4283, 4-4341, 4-4342, 4-4343; 4-ACRS-4B-01 2-CO-4D-01 |

| **Incarcerated Offender Access** | **Public Access** Yes ☒ No ☐ | **Office of Primary Responsibility** |
|---|---|---|
| Yes ☒ No ☐ | **Attachments** Yes ☒ #2 No ☐ | Security Operations Manager |

## I. PURPOSE

In order to facilitate the identification of offenders and to promote safety, security, and sanitation, this operating procedure establishes uniform personal grooming standards for offenders incarcerated in Department of Corrections facilities and provides for a Grooming Standards Violator Housing Unit to manage and encourage compliance for male offenders.

## II. COMPLIANCE

This operating procedure applies to all facilities operated by the Department of Corrections (DOC). Practices and procedures shall comply with applicable State and Federal laws and regulations, Board of Corrections policies and regulations, ACA standards, PREA standards, and DOC directives and operating procedures.

## III. DEFINITIONS

**Grooming Standards Violator** - An offender that is in violation of DOC grooming standards and has been convicted of Disciplinary Offense Code 133 and is in segregation or restrictive housing status

**Grooming Standards Violator Housing Unit (VHU)** - An offender housing unit designated to house Grooming Standards Violators with the objective to manage and encourage compliance of male offenders determined to be in violation of Department of Corrections grooming standards

**Violator Housing Unit Review Team** - A combination of treatment and security staff designated to review, counsel, and make decisions concerning grooming standards violators

## IV. PROCEDURE

A. Notice of Grooming Standards

Each facility's Offender Orientation Handbook will address appropriate clothing requirements for each area of the facility and will include grooming and personal hygiene requirements and the sanctions for non-compliance.

B. Personal Hygiene (2-CO-4D-01)

1. All offenders are expected to maintain good personal hygiene to promote a safe and healthy environment for themselves and others.

2. General population offenders will have ready access to a sink for washing, shaving, and brushing their teeth. Offenders should be given the opportunity to shower no less than three times per week. (4-4341)

3. Special housing offenders will have access to a sink, and will be given the opportunity to shower and shave at least three times per week. (4-4262)

4. Personal hygiene items will be made available to all offenders for purchase through the facility's commissary. Identified indigent offenders will be provided personal hygiene items in accordance with Operating Procedure 802.2, *Offender Finances*. (4-4342, 4-ACRS-4B-01)

5. Fingernails

    a. Offenders will trim their fingernails to extend no more than 1/8 inch beyond the tip of the finger or thumb.

    b. Fingernails will be rounded, not filed to a point.

    c. Offenders in Security Level 4, 5, and S/6 institutions are not allowed to possess personal nail clippers.

        i. These institutions shall make nail clippers available to offenders (generally through housing unit control centers) using a check-out/check-in log.

        ii. The nail clippers will be thoroughly cleaned with the currently approved disinfectant (same as for barber equipment) after each use and prior to storage.

    d. Offenders in Security Level 1, 2, and 3 institutions may possess personal nail clippers (maximum 2" length, no file), but are not allowed to possess personal toe nail clippers.

        i. These institutions shall make toe nail clippers available to offenders (generally through housing unit control centers) using a check-out/check-in log.

        ii. The toe nail clippers will be thoroughly cleaned with the currently approved disinfectant (same as for barber equipment) after each use and prior to storage.

6. Identification photographs

    a. To ensure a current likeness, identification photographs for inclusion in permanent records and on offender identification cards will be updated whenever an offender's appearance changes.

    b. When an offender, whose appearance does not comply with grooming standards in this procedure, has come into compliance, a new photograph shall be taken for all records and face cards, and a new offender identification card shall be issued.

    c. An offender who turns in an old identification card should not be charged for a new identification card needed due to change in appearance.

    d. Offenders with authorized beards

        i. Each offender who desires to have a beard shall notify the Unit Manager (major institutions) or Lieutenant (field units and work centers) so that separate identification photos can be maintained in VACORIS showing the offender without facial hair and with facial hair.

        ii. The initial identification card showing the offender without facial hair and with facial hair will be made at no charge to the offender.

C. Personal Grooming and Hair Care (2-CO-4D-01)

    1. Offenders will keep themselves and their hair clean and neat in appearance.

    2. Offenders are permitted freedom in personal grooming within the standards set forth in this operating procedure. Hair styles and beards that could conceal contraband; promote identification with gangs; create a health, hygiene, or sanitation hazard; or could significantly compromise the ability to identify an offender are not allowed. (4-4283)

    3. Facilities will ensure that all offenders, regardless of housing status, have sufficient access to hair care and barbering services that comply with applicable DOC requirements and state health regulations. (4-4343)

    4. Community Corrections facilities may have more stringent grooming requirements in accordance with the facility mission.

D. Hair Style Requirements for Male Offenders

    1. Male offenders' hair will be neatly cut, no longer than above the shirt collar and around the ears (see Attachment 1)

    2. Sideburns will not extend below the middle of the ear.

    3. Hair will not be more than one inch in thickness or depth.

   4.  Styles such as braids, plaits, dreadlocks, cornrows, ponytails, buns, mohawks, partially shaved heads, designs cut into the hair, etc., or any style that could conceal contraband are not permitted.

   5.  Hair color will not be altered, tinted, or dyed.

E.  Hair Style Requirements for Female Offenders

   1.  Female offenders' hair shall be neatly cut, no longer than shoulder length (see Attachment 1).

   2.  Hair will be kept out of the face and eyes.  Bangs are permitted but must be kept trimmed above the eyebrows.

   3.  One or two ponytails or multiple neat, tight braids are allowed.

   4.  Styles such as mohawks, "tailed" haircuts, shaved or partially shaved heads, more than two ponytails, dreadlocks, designs cut into the hair, and any style that could conceal contraband, are not permitted.

   5.  Hair color will not be altered; however facilities with DCE operated Cosmetology Programs may allow female offenders to have their hair colored within the same range as the original color.

   6.  Female offenders may be required to remove excess facial hair.

F.  Beards and Mustaches

   1.  Beards of a ¼ inch maximum length are permitted for all offenders.

      a.  No prior approval or shave pass is required.

      b.  Each offender who desires to have a beard shall notify the Unit Manager (major institutions) or Lieutenant (field units and work centers) so that separate identification photos can be maintained in VACORIS showing the offender without facial hair and with facial hair.

      c.  Offenders must continually trim and maintain the beard to not exceed ¼ inch in length.

         i.  The beard must cover the ~~entire~~ offender's natural facial hair area (those areas in which the offender is able to grow facial hair) with no shapes or designs cut into the beard.  The mustache area may exceed ¼ inch in accordance with mustache requirements. (changed 7/29/16)

         ii.  To define the beard, the offender may shave hair that grows below the jaw line and above the line from the bottom of the nose to the middle of the ear ensuring that no shapes or designs are cut.

         iii.  The Facility Unit Head will be responsible for monitoring compliance, and offenders that appear to be out of compliance, will be required to trim to come into compliance.

         iv.  Each facility barbershop will be equipped with a ¼ inch beard trimmer to be used instead of rulers or measurements to determine compliance.

   2.  A mustache is authorized for male offenders; however, it must be neatly trimmed and must not extend beyond the corner of the mouth or over the lip.

G.  Compliance with Grooming Standards

   1.  Initial Intake

      a.  On the day of initial intake into a reception or parole violator unit, every offender will receive a haircut and a shave or trim to ¼ inch beard if the offender prefers, if needed to comply with this operating procedure.

      b.  If an offender in an institution refuses to cooperate, the use of reasonable force or restraints is authorized to the extent needed to bring the offender into compliance with grooming standards.

      c.  In a Community Corrections facility, an offender that refuses to cooperate may be subject to removal from the program.

   2.  Transfer

      a.  Offenders who are scheduled for transfer to a lower security level facility must be in compliance with offender grooming standards at the time of transfer.

      b. If an offender refuses to comply, the facility should contact Central Classification to cancel the transfer.

   3. Facilities should ensure that adequate hair care or barbering services are accessible to all offenders, regardless of housing status, so that they are able to maintain compliance with the grooming standards. (4-4263)

   4. Failure to comply could pose a security risk, health hazard, or identification difficulties. Offenders who refuse to comply, or who chronically violate offender grooming standards, will be managed as potential risks to facility order and safety.

H. Institutions - Offender Management as a Result of Non-Compliance with Grooming Standards

   1. When an offender does not comply with DOC offender grooming standards, the offender will be given an order to comply.

      a. If the offender refuses to comply with the order, the offender will be charged with Offense Code 133, *Refusal to obey an order to comply with the Department's grooming standard*, (see Operating Procedure 861.1, *Offender Discipline, Institutions*) and placed in Pre-Hearing Detention (see Operating Procedure 861.3, *Special Housing*) or placed in General Detention at institutions operating under the restrictive housing program (see Operating Procedure 841.4, *Restrictive Housing Units*).

      b. No offender will be charged more than once for each separate grooming violation incident. A grooming violation incident will consist of an order, a conviction, and an assignment to segregation or restrictive housing.

   2. All offenders who refuse to comply with DOC grooming standards will remain in segregation or restrictive housing status until the offender is in compliance with the grooming standards or is housed in the Grooming Standards Violator Housing Unit.

   3. If an offender complies with the grooming standards and is released from segregation/restrictive housing status, the offender could be eligible to receive a subsequent 133 charge for failure to comply in the future.

   4. Offenders will not be restricted from earning good conduct time based solely on refusal to comply with grooming standards. An offender's class level will be determined by merit (see Operating Procedure 830.3, *Good Time Awards*). Offenders may not be assigned to Class Level I while assigned to segregation.

I. For Community Corrections facilities, an offender who does not comply with grooming requirements may be subject to removal from the program.

V. GROOMING STANDARDS VIOLATOR HOUSING UNIT (VHU)

A. Wallens Ridge State Prison (WRSP) has established a Grooming Standards Violator Housing Unit (VHU) to manage and encourage compliance of male offenders determined to be in violation of Department of Corrections grooming standards.

B. The VHU provides an evidence based approach to address non-compliance by affording grooming standards violators with an opportunity to gain certain privileges through participation in programs while reducing the use of segregation and restrictive housing in institutions. Evidence based principles are used to:

   1. House and manage grooming standards violators distinctively in order to provide the opportunity for participation in services and programs and increase quality of life.

   2. Motivate offenders to comply with the grooming standards.

   3. Discourage offenders from non-compliance with grooming standards merely for disrespectful, rebellious, or manipulative reasons.

   4. Reinforce respect for operating procedure by ensuring there are consequences for willfully

Case 7:16-cv-00485-JPJ-PMS   Document 27-1   Filed 04/17/17   Page 8 of 28   Pageid#: 137

disobeying the rules and regulations.

5. Establish a team consisting of treatment and security staff to manage the Violator Housing Unit. This team will collaborate in the review and the placement of offenders into the VHU and will ensure that the specific criteria and requirements of this operating procedure are followed. This team will consist of:

   a. Assistant Warden

   b. Chief of Housing and Programs

   c. Chief of Security

   d. Building Unit Manager

   e. Building Unit Lieutenant

   f. Unit Counselor

   g. Qualified Mental Health Professional

   h. Medical staff

C. The VHU should be reserved for grooming standards violators who meet the specific criteria for assignment.

1. To be eligible for the VHU at WRSP, grooming standards violators should meet the following criteria:

   a. Convicted of Offense Code 133 *Refusing to comply with the Department's grooming standards*

   b. No past history of disruptive or assaultive behavior as determined by review team

2. All exceptions made to the above criteria will be subject to approval by the Facility Unit Head at WRSP.

3. To initiate a transfer to WRSP for the Grooming Standards Violator Housing Unit, the institution currently housing the eligible offender should conduct an ICA Hearing in accordance with Operating Procedure 830.1, *Facility Classification Management*, documenting the offender's eligibility and recommending assignment to the VHU.

4. Central Classification Services (CCS) will review each assignment to VHU and, in VACORIS, escalate eligible offenders for review by the Facility Unit Head at WRSP and the Regional Operations Chief.

5. Prior to an offender's transfer to WRSP for placement in the VHU, the Facility Unit Head at WRSP and the Regional Operations Chief must approve the offender's admission into the VHU and will arrange transportation for offenders accepted into the VHU.

6. Movement of an approved offender to WRSP or into the VHU may be delayed pending available bed space.

7. Immediately on arrival at WRSP for placement in the VHU, a photograph of the offender will be taken and uploaded into VACORIS to document the offender's non-compliance with grooming standards. (changed 7/29/16)

D. Violator Housing Unit Incentives (See Attachment 2, *VHU Incentive Levels* for a listing of the Basic, Phase I and Phase II Level Incentives.)

1. Basic Incentives

   a. Wallens Ridge State Prison has designated two pods to be utilized as the Grooming Standards Violator Housing Unit.

   b. These two pods will be divided based upon a phased incentive program

      i. Pod 1: Designated for phase I offenders, less incentive phase

      ii. Pod 2: Designated for phase II, most incentive phase

   c. All cell assignments will be managed by the Unit Manager and counselor who will review case

Case 7:16-cv-00485-JPJ-PMS   Document 27-1   Filed 04/17/17   Page 9 of 28   Pageid#: 138

files and compare offenders for double bunks based on compatibility in accordance with Operating Procedure 425.4, *Management of Bed and Cell Assignments*.

d. VHU offenders are identified by a specific clothing color selected by the VHU Review Team and worn by all offenders housed in VHU.

e. A television set will be mounted on the unit's wall with a volume box that allows individual headset volume control inside and outside of cell. The television is considered a privileged item and can be used as an incentive or sanction tool by the VHU Review Team with the exception of approved religious or educational programming.

f. All offenders may enroll in the distance learning program provide by the Division of Education.

g. Each offender housed in Phase II of the VHU will be provided and afforded the opportunity to participate in group religious services in accordance with the facility religious service schedule

   i. Phase I offenders will not participate in group services; however, they may practice their personal religious beliefs privately/individually through prayer, meditation, reading, reflection, etc. in their cells.

   ii. Offenders may possess individual faith objects as authorized on Attachment 5, *Approved Religious Items* to Operating Procedure 841.3, *Offender Religious Programs*.

   iii. The Institutional Chaplain will be available upon written request.

h. All offenders housed in the VHU will be allowed one two-hour non-contact visit on Wednesday of each week. Special visits will be subject to approval by the Facility Unit Head.

i. All VHU offenders that qualify will be offered Re-entry services.

2. Violator Housing Unit Phase I and Phase II Incentives

   a. The Grooming Standards Violator Housing Unit is a two phased incentive living unit designed to enhance offender motivation, programming, and quality of life while deterring abuse of the program. The Phase sanctions and incentives are as follows:

   b. Phase I

      i. New grooming standards violators will be orientated into phase I and must comply with all mandated programming and cell compliance requirements for a minimum of six months before consideration for placement in Phase II.

      ii. Each new grooming standards violator will be housed in a single cell until the completion of phase I.

      iii. Grooming standards violators will be required to complete programing as specified by their Risk/Needs Assessment as well as the Challenge Series. Failure to comply or unsuccessfully complete the programming will result in removal from the VHU and initiation of disciplinary action under Operating Procedure 861.1, *Offender Discipline, Institutions*.

      iv. During normal operations, Phase I offenders will receive one hour of inside pod recreation daily and one hour, five times per week in outside exercise modules. Phase I offenders will not be eligible to participate in Gym recreation.

      v. Phase I offenders will receive their meals in the pod and will return to their cells to consume the meal.

      vi. Phase I offenders will have a commissary spend limit of $10.00 per week of consumable and hygiene items and will not be eligible to participate in the Securepak Program.

      vii. Phase I offenders, at the discretion of the Unit Manager, will be eligible for job assignments subject to job availability.

   c. Phase II

      i. All Phase II offenders will be assigned to a double cell in accordance with Operating Procedure 425.4, *Management of Bed and Cell Assignments*. Refusal will result in removal from the VHU.

      ii. Phase II offenders will have a commissary spend limit of $50.00 per week and are eligible to participate in the Securepak Program.

      iii. Phase II offenders will receive their meals in the pod and will return to their cells to consume

the meal.

    iv. During normal operations, phase II offenders will have a total of five hours out of cell activity and one hour of outside recreation daily. Phase II offenders will have access to gym recreation based on availability.

    v. Phase II offenders will be eligible for in pod job assignments. All job assignments will be at the discretion of the Building Unit Manager.

E. Removal from VHU

    1. Any violation of the specific criteria set forth in this procedure will result in the removal of the offender from the VHU and placement in special housing.

    2. Any grooming standards violator that chooses to comply with the uniform personal grooming standards will become eligible for reassignment to general population as determined by the VHU Review Team. The team may require a minimum of 30 days of compliance with grooming standards to ensure the sincerity of the offender.

VI. REFERENCES

Operating Procedure 425.4, *Management of Bed and Cell Assignments*

Operating Procedure 802.2, *Offender Finances*

Operating Procedure 830.1, *Facility Classification Management*

Operating Procedure 830.3, *Good Time Awards*

Operating Procedure 841.3, *Offender Religious Programs*

Operating Procedure 841.4, *Restrictive Housing Units*

Operating Procedure 861.1, *Offender Discipline, Institutions*

Operating Procedure 861.3, *Special Housing*

VII. FORM CITATIONS

None

VIII. REVIEW DATE

The office of primary responsibility shall review this operating procedure annually and re-write it no later than three years after the effective date.

*Signature Copy on File*        *6/27/16*

A. David Robinson, Chief of Corrections Operations    Date

| | Effective Date | | Number |
|---|---|---|---|
| **Operating Procedure** | July 1, 2015 | | 841.3 |
| | **Amended** | | **Operating Level** |
| | | | Department |
| | **Supersedes** | | |
| | Operating Procedure 841.3 (3/1/12) | | |
| | **Authority** | | |
| | COV §53.1-25, §53.1-32 | | |

| **Subject** | **ACA/PREA Standards** |
|---|---|
| **OFFENDER RELIGIOUS PROGRAMS** | 4-4182, 4-4512, 4-4513, 4-4514, 4-4516, 4-4517, 4-4519, 4-4520, 4-4521; 4-ACRS-5A-22; 2-CO-5E-01, 2-CO-5E-02 |

| **Incarcerated Offender Access** | **FOIA Exempt** Yes ☐ No ☒ | **Office of Primary Responsibility** |
|---|---|---|
| Yes ☒ No ☐ | **Attachments** Yes ☒ #5 No ☐ | Operations Support Manager |

## I. PURPOSE

This operating procedure establishes protocols to provide reasonable opportunities for offenders incarcerated in Department of Corrections facilities to voluntarily pursue religious beliefs and practices subject to concerns regarding facility security, safety, order, space, and resources. The Department of Corrections shall give no preference to the activities of one religious denomination, faith, or sect over another.

## II. COMPLIANCE

This operating procedure applies to all units operated by the Department of Corrections (DOC). Practices and procedures shall comply with applicable State and Federal laws and regulations, Board of Corrections policies and regulations, ACA standards, PREA standards, and DOC directives and operating procedures.

## III. DEFINITIONS

**Clergy** - A member of the community who is commissioned, licensed, ordained, endorsed, or otherwise accepted as a religious authority by the individual's religious organization, (i.e. Minister, Priest, Rabbi, Imam, Medicine Man, etc.)

**Common Fare** - An appropriate religious diet for offenders whose religious dietary needs cannot be met by the Master Menu; the Common Fare menu meets or exceeds minimum daily nutritional requirements.

**Facility Chaplain** - An individual who has been approved by the Facility Unit Head to coordinate religious activities within a correctional facility. Facility Chaplains are not employees of the Department of Corrections and in most cases are employees of GraceInside as provided for in the Contract with the DOC.

**Faith Review Committee** - A panel of representative Department of Corrections staff who serve in an advisory and decision making capacity regarding religious accommodation as it relates to, and impacts on, security and legitimate penological interests of the DOC

**Lay Chaplain** - A volunteer that has significant contact with offenders for the purposes of supervising and directing faith based programs, of their specific faith, in cooperation with or to supplement the DOC Facility Chaplain provided programs. Additional volunteer functions might include clerical, librarian and other duties as mutually agreed to with the Chaplain.

**Recognition of Religious Group** - For the purposes of this operating procedure, recognition of a religious group means that the group can be allowed to meet in DOC facilities based on security and management considerations. This recognition is not a judgment on the validity of the religion or of the sincerity of its followers.

**Religious Activity** - A program of a religious nature that operates within a correctional facility, including religious services, prayers, rituals, ceremonies, celebrations, study groups, and meetings

**Religious Volunteer** - A member of the community who is recognized by a faith group and who has been approved, in accordance with Operating Procedure 027.1, *Volunteer Program*, to conduct specific religious activities on a volunteer basis

## IV. PROCEDURE

**ENCLOSURE B**

A. Access to Religious Services

1.  Memos and notices relevant to volunteers and religious services should be readily available to Front Entry staff to facilitate volunteer entry to the facility.

2.  Facilities that use pass lists to control access to religious services shall develop a listing of all regularly occurring religious services in the facility separated by religion similar to *Request to Attend Religious Services* (see Attachment 1). Services that serve multiple religions should be listed under each applicable religion. (2-CO-5E-01)

   a.  Offenders at reception centers may be allowed to sign up for religious programs and services on a first-come, first-served basis (i.e. based on space and supervision at the facility).

   b.  Once offenders arrive at their initial facility assignment, they will participate in facility orientation. The orientation will include a listing of all religious groups and programs currently operating at the facility.

      i.  During facility orientation, offenders will be allowed to complete a *Request to Attend Religious Services* (see Attachment 1) to designate services they wish to attend within the religion of their choice. Offenders may not select services in more than one religion except for interfaith religious classes. (2-CO-5E-02)

      ii.  Offenders will be added to the appropriate pass lists - i.e. for the regular, ongoing activities (weekly worship services, study groups, etc.) that they have specified on the *Request*. Until the next quarterly open enrollment period (or a facility transfer), offenders may only attend the regular, ongoing religious services and programs that they have designated on the *Request*.

      iii.  As long as the offender is assigned to that facility and active in the selected religious groups, they will remain on the master pass list for the selected religious groups until they submit a new *Request* (during an open enrollment period) to remove them from the pass list or change their selections. (2-CO-5E-01)

         (a) Offenders should not be removed from the master pass list because of temporary inactivity due to temporary transfer or assignment to special housing.

         (b) If removed for such reason, the offender shall be allowed to submit a new *Request to Attend Religious Services* within the first 2 weeks after returning to general population.

      iv.  Each facility may establish a consistent standard to determine if an offender is active in their selected religious group.

         (a) This standard may be based on consecutive absences, percentage of services attended, etc. but it must be applied consistently to all offenders and all religious groups with allowance for events such as hospital admissions, assignment to special housing, temporary transfers for court appearance, etc.

         (b) The standard to determine if an offender is active in their selected religious group must be clearly stated on the facility's *Request to Attend Religious Services*.

         (c) Offenders who are deemed not active in their religious group may be removed from the master pass list for that group.

         (d) Offenders who have been removed from the master pass list for inactivity may be added back to the master pass list for that group by submitting a new *Request to Attend Religious Services* at the next open enrollment period.

   c.  Offenders who choose not to complete a *Request to Attend Religious Services* will not be penalized. They will not be allowed to submit a *Request* or to attend the regular, ongoing facility programs or services of any religion until after submitting a *Request* during the next open enrollment period. Until such time, they may practice their faith privately/individually through prayer, meditation, reading, reflection, etc. (2-CO-5E-01)

   d.  The *Request to Attend Religious Services* shall not be used to approve or deny religious property items, including religious literature.

   e.  An open enrollment period of two weeks shall be provided at least once each calendar quarter to allow offenders to change their selection of religious services to attend (including change of religion) by submitting a new *Request to Attend Religious Services*. Offenders making no

changes to their religious services do not need to submit a *Request*.

    f.   An offender transferring to another facility shall go through facility orientation at the new facility and shall be allowed to submit a *Request to Attend Religious Services* to designate services he/she wishes to attend within the religion of his/her choice. The offender will be placed on the appropriate pass lists for the services designated. The offender will be allowed to submit a *Request* to change religious services at the next open enrollment period at the new facility (regardless of their reception date at the facility).

3. The offender population shall be notified on a continuing basis, as necessary, when religious services are added or changed. The facility will determine how pass lists will be established for additional or changed services.

4. For purposes of offender movement control, facilities shall limit an offender's religious group participation to one religion at any given time (i.e. Christian, Muslim, etc.).

5. Special religious classes and special religious events (such as revivals, interfaith spiritual retreats, concerts and other special programs) may be opened up to the entire offender population at the Facility Unit Head's and Chaplain's discretion. Sign up lists and other methods that allow equal access may be used to limit numbers of offenders allowed to attend services based on space and supervision resources at the facility.

6. Facilities shall designate space appropriate to conduct religious activities and shall make available, to the greatest extent possible, a facility Chaplain or volunteer Chaplain who shall serve as an advocate for equitable accommodation of all religious faiths. (2-CO-5E-01)

    a.   Chaplains should be qualified based on clinical pastoral education or equivalent specialized training and endorsement by the appropriate religious certifying body. The Chaplain assures equal status and protection for all religions. (4-4512)

    b.   The Constitution of Virginia prohibits use of General Fund revenues to support religion; therefore Chaplains are employed by GraceInside or are volunteers. Within the limited resources of GraceInside and available volunteers, each facility strives to provide the following Chaplain access:

        i.   In facilities with an average daily population of 500 or more offenders, there is a full-time Chaplain (or Chaplains). (4-4513)

        ii.   In facilities with less than 500 offenders, there is adequate religious staffing. (4-4513)

    c.   Chaplains shall have physical access to all areas of the facility and are encouraged to make regular rounds in General Population, Special Housing, Structured Living Units (SLU), and other non-General Population housing areas in order to minister to offenders. (4-4513; 2-CO-5E-01)

    d.   No person or religious group may restrict an offender from joining or attending services of any religious group based on race, color, or nationality.

    e.   DOC staff, facility Chaplains, and religious volunteers shall not discriminate against or give preferential treatment to any offender, based on the offender's religious beliefs or practices. An offender's attendance and/or participation in religious services or activities shall at all times be voluntary. (2-CO-5E-02)

    f.   DOC staff, Chaplains, or religious volunteers shall not proselytize or coerce offenders to join or participate in the activities of a particular religion. (2-CO-5E-02)

    g.   The Chaplain (in consultation with and approval of the Facility Unit Head) should plan, direct, and coordinate all aspects of the religious program, including approval and training of both lay and clergy volunteers from faiths represented by the offender population. (4-4514; 2-CO-5E-01; 2-CO-5E-02)

        i.   Chaplains maintain oversight and scheduling ability for day to day operations of religious groups within their facilities.

        ii.   Facilities should ensure there is a secondary point of contact for religious programming (generally the Institutional Program Manager (IPM) or Volunteer Coordinator).

     iii.  The IPM or designee should have oversight authority over time and space allocation for various religious groups.

     iv.  The IPM or Volunteer Coordinator in consultation with the Facility Unit Head has responsibility for all terminations of volunteers.

     v.  Resolution for an issue or problem should occur within the following limits:
        (a) For Chaplains, five business days
        (b) For IPM/Volunteer Coordinator, seven business days
        (c) For Facility Unit Head, ten business days

     vi.  The Chaplain will review all DVD's for use in religious programs and submit them to the Institutional Program Manager or equivalent designated by Facility Unit Head for approval in accordance with Operating Procedure 801.4, *Facility Administration and Management*.

h.  The Chaplain or designated staff should develop and maintain close relationships with community religious resources. The Chaplain, in cooperation with the Facility Unit Head or designee, should develop and maintain communications with faith communities and should coordinate donations of equipment or materials for use in religious programs based on guidance from the Operations Support Manager. (4-4516, 4-4521; 2-CO-5E-01)

i.  When a religious leader of an offender's recognized faith is not represented through the chaplaincy staff or volunteers, the Chaplain should assist the offender in contacting a person who has the appropriate credentials from the faith judicatory. That person ministers to the offender under the supervision of the Chaplain. (4-4519) If the Chaplain is unable to locate or obtain the services of a qualified representative from an offender's religion, the Chaplain or other designated DOC staff shall assist the offender with obtaining religious texts, study materials, etc. for his/her religion in accordance with Operating Procedure 802.1, *Offender Property*.

j.  All recognized religious representatives should be available to all offenders within limitations of space and supervision resources at the facility.

k.  Facilities should provide adequate space and equipment for the conduct and administration of religious programs including adequate office space, storage space, and an area for a Chaplain's (lending) Library. Additionally, Chaplains should be provided with a computer, telephone line, printer/copier access, and all standard office supplies in order to carry out their duties. (4-4520, 2-CO-5E-01)

     i.  Facilities should make available the equipment needed to conduct religious programs such as a computer and LED projector as authorized by the Operations Support Manager.

     ii.  Offender clerical staff may be provided to Chaplains. Non-offender staff, such as Lay Chaplains must handle confidential material.

     iii.  Offender clerical staff shall not be left unattended in Chaplains' office areas (i.e. without the supervision of the Chaplain, other DOC staff person, or experienced volunteer) and shall NOT have access to telephones or to computers with internet connections.

7.  Religious services and group activities shall be visually observed as indicated below, and accommodations for religious programs shall be in accordance with requirements concerning a facility's security level, safety of the offender population, and orderly operations.

a.  Religious programs may be canceled when no staff is available to provide required supervision. Facilities shall not habitually cancel religious programs due to shortage of staff.

b.  Security Level 4 and Security Level 5 facilities shall have in-room DOC staff supervision (Security Staff or Counselor) or a contracted facility Chaplain when available at all times, whether or not volunteers are present.

c.  Security Level 3 facilities shall have in-room DOC staff (including Chaplain) or experienced volunteer supervision such as a Lay Chaplain.

d.  Security Level 1, Security Level 2, and Community Facilities - Facility Unit Heads shall determine the method of monitoring religious services and group activities in accordance with the requirements concerning the facility's orderly operations and safety of the offender population.

    e. Religious services and group worship shall normally be conducted by an approved spiritual leader or volunteer. If a religious group has no available spiritual leader or volunteer, offenders may meet under the general supervision of trained and authorized staff as approved by the Facility Unit Head.

    f. No offender will be recognized by the DOC as a spiritual leader, pastor, rabbi, imam or any other type of clergy.

       i. Offenders may be authorized by the Chaplain or other facility staff to lead religious programs, services or study groups. Such offenders have no authority over any other offenders. (4-4182)

       ii. Offender religious leaders should be rotated on a regular basis (if possible) to prevent abuses.

       iii. No offender will be allowed to handle or have access to confidential material concerning another offender.

8. Counseling by spiritual leaders is confidential, but may be subject to reasonable and respectful observation as necessary, and in accordance with the security level and nature of the facility. Each facility should provide an appropriate location for confidential religious counseling as needed. (2-CO-5E-02)

9. Special housing offenders may have access to approved spiritual leaders on an individual basis, and/or via closed circuit TV's in cells where applicable, unless otherwise prohibited based on legitimate safety and security concerns, consistent with the mission of the facility.

10. Offenders under full or partial facility lockdown may have access to approved spiritual leaders on an individual basis, and/or via closed circuit TV's in cells where applicable, unless otherwise prohibited based on legitimate safety and security concerns, consistent with the mission of the facility.

11. Offenders may possess individual faith objects as authorized on Attachment5, *Approved Religious Items*. (2-CO-5E-01)

    a. Requests for any exception to the operating procedure shall be forwarded using *Request for Approval of Faith Object* 841_F1, through the Facility Unit Head, to the *Faith Review Committee* for review.

    b. If the requested exception has been reviewed by the *Faith Review Committee* and a decision was made within the previous 12 months, a new review is not required. The Operations Support Manager may document the committee's decision on the *Request for Approval of Faith Object* 841_F1 without further committee review.

    c. If the requested item is approved, the list of *Approved Religious Items* should be amended to allow the approved faith object for offenders throughout the DOC.

12. DOC facility Chaplains are approved to conduct routine and emergency visits to offenders in non-DOC hospitals. Chaplains visiting offenders in hospitals must:

    a. Always carry their DOC photo identification as well as other proof of clergy status as required by the hospital

    b. Comply with all hospital rules and regulations such as visiting hours, emergency room and intensive care unit access, etc.

    c. Be aware of the duties and responsibilities of security and medical staff and should comply with their instructions

    d. Document their hospital visits and notify their facility point-of-contact that such visits have taken place

B. Religious Diets/Common Fare (2-CO-5E-01)

1. Common Fare is intended to accommodate offenders whose religious dietary needs cannot be met by the Master Menu.

    a. The Common Fare Menu has been analyzed and certified to meet or exceed minimum daily nutritional requirements.

    b. Common Fare will be offered at selected facilities designated by the Chief of Corrections

Operations.

    c. Additional information may be found in the Food Service Manual, Chapter 4, *Religious Diets/Common Fare Meals*.

2. The Institutional Classification Authority (ICA) (see Operating Procedure 830.1, *Facility Classification Management*) and the Facility Unit Head or designee must approve each offender for Common Fare prior to the offender receiving Common Fare.

3. Offenders wishing to participate in Common Fare should notify their Counselor. Counseling staff should review the *Sample Common Fare Menu* (see Attachment 4) and violation section of this operating procedure with prospective offenders.

4. Counseling staff should review the offender's facility record and other pertinent information in an attempt to locate evidence which may indicate that the offender has a sincere religious belief that requires a diet that can be met from the Common Fare menu, but not the Master Menu.

    a. The counselor should complete the *Common Fare Diet Offender Information* 841_F7 for consideration at the ICA hearing.

    b. The counselor will gather any evidence of the offender's religious beliefs, whether it's supporting or not, to present to the ICA at the scheduled hearing.

5. The ICA will consider and document any statements or documentation and information that the offender may provide to support the request for the Common Fare program. The ICA will also review all available evidence and information gleaned from pertinent facility records (e.g., VACORIS, rosters of religious service attendees, etc.) relative to the offender's request for the Common Fare diet prior to making a recommendation.

6. The following criteria will be used to screen offenders for participation in Common Fare:

    a. Religious affiliation

        i. Any offender who ascribes to a group that is listed in *Religions Approved to Operate in DOC Facilities* (see Attachment 3) is eligible to be considered for Common Fare.

        ii. Offenders who ascribe to other religions must submit a *Request for Recognition of Religious Group* 841_F2 in accordance with this operating procedure to have their group approved to operate in DOC facilities.

    b. Participation in religious services and programs

        i. Generally, six months participation is considered an adequate test of sincerity.

        ii. Participation is generally defined as attending services or programs at least twice a month as documented from a pass list or attendance list.

        iii. If a facility does not have services for the religious group in question, then the offender should possess relevant religious literature or request it from the Chaplain.

7. The ICA may verify the authenticity of documents and statements presented by the offender.

8. All offenders requesting the Common Fare diet will be required to sign a *Common Fare Agreement* 841_F8.

9. The ICA will ensure that the ICA hearing is thoroughly documented in VACORIS, including any offender statements, evidence considered, etc., with regard to the Common Fare request. The *Common Fare Diet Offender Information* 841_F7 should be uploaded in VACORIS.

10. The ICA should advise the offender that generally, if approval for participation is granted, a two to four week waiting period will occur prior to the offender actually receiving Common Fare foods.

11. Facility staff (generally the Counselor) shall monitor VACORIS for approval of the Common Fare request.

    a. In Common Fare facilities, upon receipt of approval for an offender's participation in Common Fare the Food Operations Director/Manager shall be notified.

    b. In other facilities, the offender must wait for transfer to a facility that offers the Common Fare

diet.

c. All offenders approved for Common Fare will be provided a copy of the *Institutional Classification Authority Hearing* report as notification that their request has been approved.

d. The Common Fare diet will not be provided to an offender that refuses to sign the *Common Fare Agreement*. The signed *Agreement* should be scanned into VACORIS and a copy provided to the offender.

e. An offender who is approved for Common Fare and transfers into a facility that offers the Common Fare diet should begin receiving Common Fare meals as soon as practical, no later than 7 days after arrival at the facility.

12. Commissary Products - Offenders on Common Fare may purchase and consume any food items from the commissary that are not clearly marked as containing pork or pork derivatives or containing a combination of meat and dairy ingredients. A separate commissary list that allows Common Fare offenders to only purchase certain items is not permitted.

13. An offender may voluntarily withdraw from Common Fare.

a. An offender that requests to be voluntarily removed from Common Fare should provide the reason for the removal in writing to their counselor to be scanned into VACORIS with the ICA action for removal.

b. The withdrawal should be documented by ICA action with review and approval by the Facility Unit Head or designee.

c. An offender who voluntarily withdraws from Common Fare cannot reapply for one year.

d. An offender who voluntarily withdraws from Common Fare for the second time cannot reapply for two years.

e. An offender that voluntarily withdraws from Common Fare a total of three times over the entire incarceration period will be removed for 4 years on the third and each subsequent occasion.

f. An offender that voluntarily withdraws from Common Fare and wishes to again receive the diet after the waiting period noted above must formally apply subject to ICA review and Facility Unit Head or designee approval.

14. Offenders will be suspended/removed from Common Fare for violating any of the criteria of the *Common Fare Agreement* 841_F8. The Food Operations Director/Manager or other staff should notify the Facility Unit Head or designee if:

a. An offender fails to pick up a minimum of seventy-five percent of meals served per month. (See minimum number of meals monthly schedule - attached to *Common Fare Agreement*).

b. An offender is detected or observed eating, trading, or possessing unauthorized food items from the main line.

c. An offender is observed giving away or trading a Common Fare food item.

d. An offender is found to have purchased or observed eating food items from the Commissary inconsistent with dietary requirements of the Common Fare program.

e. An offender has not continued to attend services or other religious activities at least twice per month, if available.

15. Violation of Common Fare will result in the following sanctions:

a. First Offense - suspension from Common Fare for 6 months documented by ICA action with review and approval by the Facility Unit Head or designee

b. Second Offense - suspension from Common Fare for 1 year documented by ICA action with review and approval by the Facility Unit Head or designee

c. Third and each subsequent Offense - removal from Common Fare for 4 years imposed at an Institutional Classification Authority hearing and approved by the Facility Unit Head or designee.

d. An offender suspended from Common Fare for a First or Second Offense may submit a written

request to the Facility Unit Head or designee to be reinstated after the penalty period has expired. The reinstatement must be documented in VACORIS.

    e. An offender removed from Common Fare for a Third and each subsequent Offense that wishes to again receive the diet after the penalty period, must formally apply subject to ICA review and Facility Unit Head or designee approval.

16. Combinations of voluntary withdrawals and removals due to violation of Common Fare:

    a. If an offender is removed from Common Fare, either voluntarily or due to violations of the *Common Fare Agreement,* 4 or more times during the current period of incarceration, each removal shall be for 4 years.

    b. Example: An offender has voluntarily withdrawn from Common Fare once and been removed twice for violations of Common Fare. If the offender voluntarily withdraws to avoid a third violation, he will be removed and cannot reapply for 4 years due to this being the fourth time he has come off the Common Fare Diet.

C. Guidelines for Religious Group and Religious Holy Day/Season Participation (2-CO-5E-01)

1. It is recognized that although each offender has the right to worship in their chosen manner, levels of offender participation and availability of facility resources and religious leaders do not permit separate services for every possible form of worship at every facility. This section is provided as general guidance for organization of religious services and the observation of certain religious holy days and/or seasons to provide the greatest access and participation possible.

2. To ensure consistent observances within the DOC, a memorandum should be issued from the Chief of Corrections Operations as each holy day/season approaches announcing the eligible religions and dates for observance.

    a. Information on holy days/seasons shall be provided to the offender population including any facility-specific information such as sign-up procedures and any deviation from routine facility operations.

    b. The *Master Religious Calendar* (see Attachment 2) is provided as a guide for planning holy day and religious observances; memos providing specific dates and guidance for observances will override the *Calendar*.

    c. Any sincerity requirement for offenders wishing to participate in holy day/season observances shall not be based solely on a requirement that the offender show possession of tangible religious property pertaining to the relevant faith i.e., an offender wishing to participate in Ramadan/NOI Month of Fasting will not be required to show possession of items such as a kufi, a Qu'ran, a prayer rug, or religious pamphlets.

3. Pass lists and Program Sign-In Sheets are essential to maintain offender accountability and shall be used to control and document participation in all religious services and programs.

    a. Participation in holy day/ season observances will be limited to those offenders that are on the pass list at the time of the observance for one or more services within designated religions that observe that holy day/season.

    b. Offenders not on the pass list for services of the designated religions are ineligible to participate and shall be struck from the sign-up list.

    c. Pass lists for each religion's ongoing services should be updated at least quarterly to allow offenders to change their religious participation.

    d. If the number of offenders on the pass list exceeds the space available for the services, then the pass lists shall be rotated by building so that each building will have equal access to religious services.

    e. Sign-In Sheets should be utilized to record offender participation for all religious programs, services, and meetings. The facility Chaplain and/or other designated DOC staff shall work with security staff to see that Sign-In Sheets are present at all religious meetings and events. Sign-In

Sheets will be kept on file by the Chaplain or other designated facility staff for accountability purposes.

4. Muslim holy days and seasons may be observed by Islam (Sunni Muslim, Shiite Muslim), Nation of Islam (NOI), and Moorish Science Temple of America (MSTA).

   a. Observances and practices include Ramadan (Muslim)/Month of Fasting (NOI/MSTA), the Eid-ul-Fitr feast, and the Eid-ul-Adha feast.

   b. Any special meals will be served at a separate time and/or area from the general offender population.

   c. Islam (Sunni Muslim, Shiite Muslim) should also observe these holy days, seasons, meals and services separately from the NOI and MSTA groups to the extent possible within space, time, and staff resources.

   d. Due to the separate and distinct belief systems of the NOI and MSTA groups, where offender participation, time, space, and staff supervision allow, these two groups should each have their own separate observances, meals, etc. on the holy days and seasons.

      i. Where limited participation or resources require, NOI and MSTA may dine together and/or conduct joint worship services, study sessions, or observances. Due to differences in belief systems, a shared meal is preferable to shared services or observances.

      ii. NOI and MSTA have certain holy days that are unique to their own faiths, and these will be announced.

   e. Offenders participating in Ramadan/Month of Fasting shall be provided the opportunity to take their medications before dawn or after sunset either through special pill calls or self-medication. Offenders should consult with the medical staff and shall take all responsibility for the possible consequences of taking medications at intervals not recommended by the medical staff.

   f. The Observance of Ramadan or the NOI Month of Fasting should not interfere with regular work or program assignments.

   g. Offenders participating in the Observance of Ramadan or the NOI Month of Fasting are not exempt from random drug testing during this period. Randomly selected offenders who are fasting during daylight hours should be tested during those periods of time when they are allowed to eat and drink (i.e. before dawn and after sunset). All other drug-testing regulations apply.

   h. Participating offenders should be permitted to fast during the daylight hours and to observe prescribed times of prayer and spiritual reading individually after work assignments and activities have been accomplished.

   i. Any offender who eats commissary food items or seeks a meal tray between dawn and sunset during the religious fast of Ramadan, after having chosen to participate in Ramadan or NOI Month of Fasting, shall not be removed from Ramadan participation or otherwise penalized.

5. Jewish holy days and seasons may be observed by Jews, Messianic Jews, and Yahwists (House of Yahweh, etc.).

   a. Observances include, but are not limited to Passover, Sukkoth, Shavuot, and Chanukah.

   b. Any special meals will be served at a separate time and/or area from the general offender population.

   c. Jews should observe these holy days, seasons, meals, and services separately from Messianic Jews and Yahwists to the extent possible within space, time, and staff resources.

   d. Due to the separate and distinct belief systems of Messianic Jews and Yahwists, where offender participation, time, space, and staff supervision allow, these two groups should each have their own separate observances, meals, etc. on the holy days and seasons.

      i. Where limited participation or resources require, Messianic Jews and Yahwists may dine together and/or conduct joint worship services, study sessions, or observances. Due to differences in belief systems, a shared meal is preferable to shared services or observances.

      ii. Messianic Jews and Yahwists are also generally approved to observe and participate in

Christian holy days and seasons as these groups have both Jewish and Christian elements. Messianic Jews and Yahwists may observe the Christian holy days in conjunction with the Christians. Separate observances are not required.

   e. Any offender who eats commissary food items or a regular meal tray, after having chosen to participate in the Common Fare Passover Meal, shall not be removed from Passover participation or otherwise penalized.

6. Christian holy days/seasons may be observed by Roman Catholic, Greek Orthodox, Protestant denominations, Jehovah's Witnesses, Church of Jesus Christ of Latter Day Saints (Mormons), and Messianic Jews.

   a. Observances recognized by the DOC are Easter and Christmas.

   b. It is recognized that there will be staffing shortages and heavy visitation but all Facility Unit Heads must allow a worship service or services on these holy days.

      i. An interdenominational Easter service may be held as either a sunrise service, afternoon service, or evening service as determined by the Facility Unit Head and the Chaplain in consideration of visitation and staffing issues.

      ii. An interdenominational Christmas service may be held either Christmas Eve or Christmas Day. Both Christmas Eve and Christmas Day services may be held at the Facility Unit Head's discretion depending on time, space, supervision, and Chaplain or religious volunteer availability.

   c. Most facilities have very few Roman Catholic and/or Greek/Eastern Orthodox offenders. It can also be difficult for Chaplains to find and recruit religious volunteers (clergy or laity) for these groups.

      i. At facilities that do not have at least weekly Catholic services, offenders who choose to attend services for these faith groups should be allowed to participate in Protestant Christian worship services, studies, meetings, and observances.

      ii. Participation in Protestant Christian services should be allowed even at facilities where there are occasional studies or services (Eucharist services, etc.) for these smaller faith groups so that these offenders will have the opportunity to regularly participate in Christian worship services.

   d. Jehovah's Witnesses, Church of Jesus Christ of Latter Day Saints (Mormons), and other smaller faith groups should be provided with services, studies, and observances separate from other Christian groups where offender participation, time, space, and supervision permit.

D. Faith Review Committee

1. The *Faith Review Committee* shall be comprised of DOC employees who are appointed by the Chief of Corrections Operations. Ad hoc committee members may be included, as needed, to provide expertise on specific religions.

2. The *Faith Review Committee* shall ensure DOC-wide consistency for offender accommodation of religious property and practices based on legitimate facility security and operational concerns.

3. The *Faith Review Committee* shall receive referrals from Facility Unit Heads on disputed faith property and practices, and shall determine whether a requested property item, practice, or accommodation should or should not be approved in accordance with DOC procedures.

4. The *Faith Review Committee* shall meet at most quarterly, but may review referrals from facilities more often on an as-needed basis.

5. *Faith Review Committee* recommendations shall be referred to the Chief of Corrections Operations and Corrections Operations Administrator for review and approval prior to notifying facilities of changes.

E. Available Religious Programs

1. The DOC has reviewed religious groups operating services, study groups, etc. in DOC facilities and

recognized specific religions that may operate without further approval in DOC facilities where offender participation, facility resources, and religious leadership are available.

    a. This recognition confers no rights or privileges to offenders who practice these religions that are not available to all other offenders.

    b. The current religions that are recognized to operate in DOC facilities are listed in *Religions Approved to Operate in DOC Facilities* (see Attachment 3)

2. Offender requests for new religious group activities not currently offered at a facility shall be submitted on a facility offender request form if the religious group is listed on *Religions Approved to Operate in DOC Facilities* (see Attachment 3). If there appears to be sufficient offender interest, the Facility Unit Head, in consultation with the facility Chaplain, should consider the request and provide time and space for the group to meet within the restrictions of the facility security level, mission, space, time, available supervision, etc.

3. Offender requests for new religious groups or activities not currently recognized by the DOC shall be submitted on a *Request for Recognition of Religious Group* 841_F2 to the Facility Unit Head or designee who shall be a DOC employee.

    a. Each request shall be as complete and well documented as possible.

    b. An outside sponsor, clergy person, or organization is not required to establish a new religious group or to maintain a religious group at a facility.

4. The Facility Unit Head shall review the *Request for Recognition of Religious Group*.

    a. If the religion is not listed on Religions Approved to Operate in DOC Facilities (see Attachment 3) and the Request is complete, the Facility Unit Head shall attach a *Routing Slip for Recognition of Religious Group* 841_F3 indicating recommendation to approve or disapprove the *Request for Recognition of Religious Group*.

    b. The Facility Unit Head will refer the request and supporting documentation to the *Faith Review Committee* for recommendation to the Chief of Corrections Operations.

5. The Chief of Corrections Operations shall make the final decision to add a proposed religious group to *Religions Approved to Operate in DOC Facilities* based on information presented.

F. Controls

1. Offenders should have the opportunity to participate in practices of their religious faith, limited only by documentation showing a threat to the safety of persons involved in such activity or that the activity itself disrupts order in the facility. Some religious activities may be limited, restricted, discontinued, or denied by the Facility Unit Head based upon legitimate concerns regarding security, safety, facility order, space, or resources. (4-4517, 4-ACRS-5A-22)

2. The Facility Unit Head shall authorize and approve reasonable special visits between offenders and spiritual leaders, and shall approve the scheduling of days and times for religious programs and activities. (2-CO-5E-01)

3. Communal and individual religious property shall comply with all Department and facility procedures relating to contraband, alteration, and approval. (2-CO-5E-01)

    a. Violations may result in disciplinary action and/or confiscation of property.

    b. Communal faith items not specifically authorized may be approved by the Chief of Corrections Operations, and shall be strictly controlled.

    c. Communal faith items shall be stored in a secure area of the facility and made available to offenders during approved worship times.

    d. Tefillin (phylacteries)

       i. This Jewish prayer item shall be stored in the Shift Commander's office to be available to offenders on request.

       ii. Tefillin may be used 6 days a week (not on the Sabbath (Saturday)) for a maximum of 30

       minutes and returned immediately after use. It must be used under staff observation in a designated area near the Shift Commander's office and shall not be taken to an offender's housing area.

    iii. Only those offenders who have attended Jewish services at least twice per month (or possess Jewish literature if services not available) for at least 6 months are eligible to use Tefillin.

    iv. Access to Tefillin will not be permitted in special housing units or during institutional lockdown.

4. All religious items are subject to respectful search.

    a. Any offender who does not wish to have a religious item(s) searched shall be allowed to mail the item home or have the item disposed of in accordance with DOC procedures.

    b. Newly received offenders entering the DOC, including out-of-state intakes must agree to have their items searched and/or x-rayed. If the offender does not wish to have the item(s) searched, the offender shall be allowed to mail the item home or have the item disposed of in accordance with DOC procedures.

5. Facility security and safety considerations may restrict certain aspects of accepted religious practice including but not limited to:

    a. Restricting use of alcohol and other drugs in religious services:

       i. If required for the religious service, clergy may bring into the facility a maximum of 1 fluid ounce of wine in a transparent/translucent plastic container for consumption by the clergy only. The clergy shall remove the container and any remaining wine from facility grounds at the conclusion of the service.

      ii. Catholic offenders and other groups that do not allow wine substitutes will receive communion by use of bread or wafer only.

     iii. Groups that allow substitutes for wine may allow offenders to consume grape juice or fruit flavored mixes in the communion service.

    b. Limiting or prohibiting certain personal property items (see Operating Procedure 802.1, *Offender Property*)

    c. Requiring adherence to DOC dress and grooming requirements (see Operating Procedure 864.1, *Offender Grooming and Hygiene*).

6. All religious items other than publications approved by the *Faith Review Committee* for individual offender possession must be purchased from the facility commissary. Any DOC approved religious item that is not regularly stocked by the commissary Contract Vendor will be provided through the Special Order process in Operating Procedure 801.6, *Offender Services*.

7. Handling of religious literature shall be consistent with Operating Procedure 803.2, *Incoming Publications*, and specific guidance from the Chief of Corrections Operations. (2-CO-5E-01)

8. Offender special religious diet requests shall be consistent with Food Service Manual, Chapter 4, *Religious Diets/Common Fare Meals*.

9. Donated Individual Faith Items and Communal Property for Religious Activities

    a. Facilities may receive donated individual faith items and communal items for use in religious activities from Faith Based Organizations or other Community groups provided the donated item has been reviewed and approved by the *Faith Review Committee* and is listed on Attachment 5, *Approved Religious Items*.

    b. Donated individual faith items must comply with the restrictions imposed by the *Faith Review Committee* as indicated on Attachment 5, *Approved Religious Items* to include size, color, material, etc.

    c. Organizations that wish to donate a religious item or any other item for use in religious activities that is not on the *Approved Religious Items* list must submit a written request on organization letterhead to the Operations Support Manager for review and approval by the *Faith Review*

*Committee.* The written request must include the type and quantity of items for donation as well as a physical description such as the size, color, material, etc.

    d. All individual faith items donated by Faith Based Organizations or other Community groups for distribution to offenders shall be donated to the DOC and issued by the Chaplain.

       i. Donations to a specific offender are prohibited.

      ii. Offenders may request a donated individual faith item by contacting the facility chaplain who based on item availability will provide the offender with the item.

10. The Chaplain shall receive prior written authorization from the Facility Unit Head for any publications (books, texts, magazines, CD's, etc.) donated to the facility for religious use. See Operating Procedure 803.2, *Incoming Publications* for additional guidance on publications.

       i. Any free or donated religious texts, books, or individual faith items that the Chaplain issues to an offender must be routed through the facility property officer so the items can be added to the offender's property inventory list.

      ii. Items of negligible monetary value such as pamphlets, newsletters, etc. are not subject to prior approval but are subject to DOC operating procedures governing searches, offender property, and contraband.

    b. Donations of Communal Property (as approved on the *Approved Religious Items*, Attachment 5) shall become the property of DOC

    c. Operating Procedure 801.4 *Facility Administration and Management* provides specific guidance on digital video discs (DVD's) donated for religious programs.

    d. Any request for an exception to the donation requirements of this procedure must be submitted for approval in writing to the Operations Support Manager.

11. In the course of searching or examining offender religious objects, employees shall remain cognizant that consecrated or blessed items, or items that are considered sacred, should be treated with respect and appropriate care.

12. The standard minimum number of offenders required to establish, maintain and hold group services, programs or meetings for a religious group is five. (2-CO-5E-01)

    a. Some of the DOC recognized religions will have fewer adherents at certain facilities. In such cases, the Facility Unit Head has the discretion to lower the minimum number and allow a group to be established and to meet if staff, space, and meeting time slots are available.

    b. Offenders have a constitutional right to religious expression; the facility must balance these rights with offender movement, room capacity, staffing challenges and in-room supervision at certain security levels. No recognized religious group with the minimum number of adherents should be denied at least one service and one study session per week. (Note: Jumah and Talim services shall not take place on the same day and must be scheduled to take place on separate days of the week).

    c. Services, meetings, or programs for religions not recognized by the DOC shall not be allowed. Adherents may apply for recognition as outlined above.

    d. Religious groups shall not be allowed to hold formal meetings without staff authorization, approval, and required supervision. This does not prohibit informal religious discussions in leisure areas such as dayrooms or recreation yards as long as the group does not disrupt other offenders authorized to use the same area.

13. Offenders may not make monetary donations to GraceInside. (the contracted organization that hires, supervises and compensates the institutional Chaplains), as this is a conflict of interest.

14. Offenders may not make monetary donations to churches or ministries in the community for which the facility Chaplain serves as a minister, pastor, priest, director, etc., as this is a conflict of interest.

15. Chaplains are subject to all work policies, laws, guidelines, rules, and regulations that apply to DOC employees, including confidentiality and security procedures, unless otherwise stated in this operating procedure.

16. Chaplains, Muslim Imams and all other religious workers that accompany the Imam shall sign in and out on the *Chaplain/ Imam Sign -In Sheet* 841_F20.

    a. The *Chaplain/ Imam Sign -In Sheet* 841_F20 shall be stored in a binder located at the facility's perimeter access point for volunteers.

    b. All other volunteers and religious workers (other than those who accompany the Imams) shall sign in and out on the facility provided volunteer log located at the perimeter access point.

17. Chaplains, due to the nature of their work, may have to interact with offenders in ways that are unique and different from regular employees.

    a. Chaplains may be authorized to interact with offenders in a supervised (probation/parole) or ex-offenders in non-supervised (direct release) correctional status to facilitate their re-entry into the community. Interactions should be professional and transitional in nature. Such activities include, but are not limited to, the following:

        i. Inviting ex-offenders to their place of worship for services, study groups, pastoral counseling, potential membership, etc.

        ii. Providing transportation, clothing, food, and other such assistance

        iii. Assisting with obtaining housing, education, vocational training, or job placement

    b. Chaplains must apply using a *Request for Chaplain Interaction with an Offender or Ex-Offender* 841_F4 and be approved by the Unit Head of the facility at which they are serving.

    c. Normally a Chaplain should only assist ex-offenders that were incarcerated at the facility where they serve. In some cases, Chaplains may be approved to assist offenders that were incarcerated at other facilities. Example: The Chaplain directs or works for a halfway house or step-down facility and wishes to provide services for an ex-offender that was released from a different facility. In such cases, the Chaplain will still submit the *Request* to their own Facility Unit Head, but shall note on the form that the ex-offender was released from a different facility. The Chaplain should state the justification for providing services to this ex-offender.

    d. A Chaplain who wishes to assist a released offender who is on active supervision (probation, parole, etc.) must also receive the approval of the Chief Probation and Parole Officer of the offender's P&P District so that the supervising P&P Officer can be notified.

    e. The *Request for Chaplain Interaction with an Offender or Ex-Offender* will be maintained at the facility (if the request is being made prior to the offender's release), or it will be placed in the Probation and Parole case file if the offender is in community release status. If there is no probation or parole supervision involved (and the ex-offender is already living in the community), the form will be placed in the Chaplain's personal files at the facility. Chaplains should keep copies of all *Request for Chaplain Interaction with an Offender or Ex-Offender* in their personal files for documentation.

    f. Prohibited actions:

        i. Chaplains may not provide money or financial assistance to ex-offenders out of their personal funds.

        ii. Chaplains may not provide legal assistance (hiring or paying lawyers, contacting victims, etc.) to/for ex-offenders.

        iii. Chaplains shall not have ex-offenders live in their personal home or residence.

        iv. Chaplains shall not hire ex-offenders as personal employees, i.e. housekeeper, grounds keeper, maintenance or repair duties, etc.

    g. Chaplains who request interaction with offenders/ex-offenders outside the facility shall review Operating Procedure 130.1, *Rules of Conduct Governing Employees Relationships with Offenders* to be aware of fraternization restrictions and to help avoid even the appearance of impropriety. Crossing the line from professional to personal (overly friendly/familiar, romantic or sexual) relationships with ex-offenders or serving as a conduit for information and/or contraband between ex-offenders and currently incarcerated offenders will be dealt with to the full extent of DOC procedures and the law.

V. REFERENCES

Food Service Manual, Chapter 4, *Religious Diets/Common Fare Meals*

Operating Procedure 027.1, *Volunteer Program*

Operating Procedure 130.1, *Rules of Conduct Governing Employees Relationships with Offenders*

Operating Procedure 801.4, *Facility Administration and Management*

Operating Procedure 801.6, Offender Services

Operating Procedure 802.1, *Offender Property*

Operating Procedure 803.2, *Incoming Publications*

Operating Procedure 830.1, *Facility Classification Management*

Operating Procedure 864.1, *Offender Grooming and Hygiene*

VI. FORM CITATIONS

*Request for Approval of Faith Object* 841_F1

*Request for Recognition of Religious Group* 841_F2

*Routing Slip for Recognition of Religious Group* 841_F3

*Request for Chaplain Interaction with an Offender or Ex-Offender* 841_F4

*Common Fare Diet Offender Information* 841_F7

*Common Fare Agreement* 841_F8

*Chaplain/ Imam Sign -In Sheet* 841_F20

VII. REVIEW DATE

The office of primary responsibility shall review this operating procedure annually and re-write it no later than three years from the effective date.

*Signature Copy on File*                    *5/18/15*

A. David Robinson, Chief of Corrections Operations          Date


## Institutional Classification Authority Hearing

---

**Offender Name: Depaola, Eric**   **DOC#: 1145137**   **DOC Location: Red Onion State Prison**   **Bed Assignment: C-2-SLS-208-B**

---

### Part I: ICA Referral Notice

You were scheduled to appear before the Institutional Classification Authority on or after 03/01/2017 for Internal Status

Comments: 90 day appropriate housing hearing

Authorizing Staff                     Date & Time

Hearing Date: 3/1/2017

Offender Statement: No statement

Reporting Staff Comments: Remain segregation.  Offender has completed The Challenge Series.

---

### Part II: Hearing Disposition

**Internal Status Review:**

The ICA recommends: Internal status change to Intensive Management 2

Rationale: Remain segregation until he can be reviewed by the DTT.  Offender has completed The Challenge Series.

ICA: Kiser, Justin W                     Date: 3/1/2017

---

**Administrative Review:**

Decision: Approve                     Internal status change to Intensive Management 2

Duncan, Amee B                     Date: 3/2/2017

Comments: Remain segregation until he can be reviewed by the DTT. Offender has completed The Challenge Series.



VIRGINIA DEPARTMENT OF CORRECTIONS

## Institutional Classification Authority Hearing Notification Form

DOC-11G
DOC Location: Red Onion State Prison
Report generated by Sowards, E N
Report run on 2/27/2017 at 8:39 AM

| Offender Name: Depaola, Eric | DOC#: 1145137 | DOC Location: Red Onion State Prison |
|---|---|---|

### Part I: ICA Referral Notice

Classification Action being reviewed:

Comments: 90 day appropriate housing hearing

You will be scheduled to appear before the Institutional Classification Authority on or after 3/1/2017

Authorizing Staff                         Date & Time

A formal due process hearing is required when an offender is considered for removal from general population, or faces the possibility of increase in security level or reduction in good time earning level outside the Annual Review Cycle.  You will be permitted to:  1)  Be present at the hearing  2)  Remain silent  3)  Know the reasons for any decisions rendered by the ICA  4) Have your counselor or an employee present to assist you 5) Receive a copy of the written findings and recommendations of the ICA.  During hearings based solely on documented Disciplinary Hearing Referrals the following is not afforded to you:  1) Hearing the Reporting Officer's testimony 2) Cross-examining adverse witnesses 3) Calling and cross-examining witnesses.

This is to certify that I have received a copy of this notice and it was explained to me. I am requesting witness/s to appear on my behalf.

Witness Request:      1 _____      2 _____      3 _____

**I Waive rights to 48-hour notice.**  ☐ Yes  ☑ No          **I wish to attend.**  ☑ Yes  ☐ No

_Eric DePaola_                    2-27-17          _Sowards Cnc_                    2-27-17
Offender Signature              Date                 Witness Signature              Date

_No Statement_

Rev. 04/15/2010