UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

ERIC DePAOLA,

                Plaintiff,

      v.

H. CLARKE, *et al.*,

              Defendants.

Civil Action No. 7:16-cv-00485

## PLAINTIFF ERIC DEPAOLA'S OBJECTIONS TO
## THE FEBRUARY 5, 2019 REPORT AND RECOMMENDATION

AMERICAS 98665065

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF OBJECTIONS ............................................................................. 1

II.    PROCEDURAL BACKGROUND .......................................................................... 3

III.   STANDARD OF REVIEW .................................................................................. 3

IV.    OBJECTIONS TO FACTUAL FINDINGS ........................................................... 4

    A.   Defendant Lyall Failed to Provide Mr. DePaola with Access to Barber Services .................................................................................................. 6

    B.   The Other Defendants Did Not Prevent or Correct the Failure to Provide Mr. DePaola with Access to Barber Services ............................................. 8

    C.   Mr. DePaola Did Not Receive Barber Services, and Any Additional Requests Would Not Have Precluded Punishment ..................................... 9

V.     OBJECTIONS TO LEGAL CONCLUSIONS ...................................................... 12

    A.   Each Defendant Is Liable Under Section 1983 ......................................... 14

    B.   Each Defendant Is Also Liable Under RLUIPA ............................................ 20

VI.    THE COURT SHOULD ADOPT MR. DEPOLA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ............................................................ 22

VII.   CONCLUSION ................................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Brown v. Ray*,
   695 F. Supp. 2d 292 (W.D. Va. 2010) ............................................................................22

*Cravey v. Univ. of N.C. at Chapel Hill*,
   No. 17-cv-1014, 2018 U.S. Dist. LEXIS 158890 (M.D.N.C. Sep. 18, 2018) ...............2, 13

*Holt v. Hobbs*,
   135 S. Ct. 853 (2015)...........................................................................................................21

*Kennedy v. City of Cincinnati*,
   595 F.3d 327 (6th Cir. 2010) ..............................................................................................20

*Lovelace v. Lee*,
   472 F.3d 174 (4th Cir. 2006) ..............................................................................................21

*Miles v. Moore*,
   450 F. App'x 318, 319 (4th Cir. 2011) ...............................................................................20

*Putman v. Gerloff*,
   639 F.2d 415 (8th Cir. 1981) ..............................................................................................20

*Randall v. Prince George's Cty.*,
   302 F. 3d, 188, 204 (4th Cir. 2002) ..............................................................................14, 20

*Reid v. Clarke*,
   No. 16-cv-547, 2018 U.S. Dist. LEXIS 126722 (W.D. Va. Jul. 30, 2018) ..........15, 16, 17

*Shaw v. Stroud*,
   13 F.3d 791 (4th Cir. 1994) ................................................................................................14

*U.S. v. George.*,
   971 F.2d 1113 (4th Cir. 1992) ..............................................................................................4

*Wilkins v. Montgomery*,
   751 F.3d 214 (4th Cir. 2014) ............................................................................15, 16, 17

**Statutes**

28 U.S.C. § 636...................................................................................................................1, 3

42 U.S.C. § 1983.................................................................................................................1, 3

42 U.S.C. § 2000cc .............................................................................................................1, 3

AMERICAS 98665065

Pursuant to 28 U.S.C. § 636(b)(1)(C), Plaintiff Eric DePaola submits the following objections to the Report and Recommendation of United States Magistrate Judge Pamela Sargent dated February 5, 2019, recommending that the Court find in favor of the Defendants.

As set forth below, Mr. DePaola respectfully requests that the Court sustain his objections, decline to adopt Judge Sargent's incorrect findings and recommendations, and find in his favor on his remaining claims under the First Amendment of the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq*.

## I.    SUMMARY OF OBJECTIONS

On March 30, 2018, Judge James P. Jones referred to Magistrate Judge Pamela Meade Sargent for a bench trial and a report and recommendation the following three factual questions:

> (1) Did in fact any of the defendants Barksdale, Gallihar, Swiney, Still, Duncan, Lyall, Fleming, and Stanley fail to provide barber services to plaintiff DePaola in 2015 and 2016, or did not prevent or correct such failure, and thereby prevented DePaola from adhering to sincerely held religious beliefs? (2) Was in fact any punishment or loss of privileges imposed on DePaola for failure to comply with the applicable grooming policy so disproportionate to legitimate penal needs, so as to violate DePaola's sincerely held religious beliefs? (3) If DePaola's religious rights were violated, what monetary damages or injunctive relief, if any, should be awarded?

*See* ECF No. 56 at 18-19.

Addressing only the first factual question referred to her, Judge Sargent incorrectly concluded that the Defendants' "actions in enforcing the grooming policy did not substantially burden DePaola's rights to freely exercise his religious beliefs" for two primary reasons: (i) the Defendants did not "purposefully den[y]" Mr. DePaola barber services; and (ii) "barber services would have been made available to allow DePaola to comply with the grooming policy" if Mr. DePaola had asked (which he did).  *See* Report and Recommendation, ECF No. 137 at 29, 31.  These conclusions are factually and legally wrong.

The conclusions are factually wrong because the trial record does not establish that barber services would have been made available to Mr. DePaola had he requested them.  To

the contrary, the record establishes that barber services were not available even when he requested them. The Report and Recommendation concluded that "barber services were not made available to" Mr. DePaola by the Defendants and others "as often as they should have been in 2015" before Mr. DePaola was punished. ECF No. 137 at 29. In fact, as the Report and Recommendation further acknowledged, records of the Virginia Department of Corrections (VDOC) presented at trial show that "there was no barber working in the C-5 pod from April 27 to December 13, 2015." *See id.* Thus, the record establishes that, in fact, no barber would have been available had Mr. DePaola asked for one (which he did). *See* October 16, 2018 Trial Transcript, ECF No. 130, 106:23-107:8.

The conclusions are legally wrong because Mr. DePaola had no duty to request barber services, and barber services need not have been "purposefully denied" to Mr. DePaola for each Defendant to be liable under Section 1983 or RLUIPA (as the Court's Summary Judgment Order reflects). *See, e.g.*, Summ. J. Op. and Order, ECF No. 56 at 18 ("Did in fact any of the defendants . . . fail to provide barber services to plaintiff DePaola in 2015 and 2016, or *did not prevent or correct such failure* . . . .") (emphasis added); *Cravey v. Univ. of N.C. at Chapel Hill*, No. 17-cv-1014, 2018 U.S. Dist. LEXIS 158890, at *24 (M.D.N.C. Sep. 18, 2018) (liability under § 1983 requires only that defendants "acted personally," i.e., that they had personal knowledge of and involvement in the deprivation of rights). The Defendants were each personally obligated to ensure that Mr. DePaola had access to barber services under VDOC policies before punishing him; they did not so ensure, and then they participated in punishment that substantially burdened Mr. DePaola's firmly held religious beliefs, despite Defendants' failure to ensure that Mr. DePaola had access to barber services.

In addition, at trial, the Defendants did not meet their burden by offering any legitimate penological justifications for their actions. To the contrary, the Defendants clearly had alternatives to the punishment they imposed on Mr. DePaola, which served no legitimate

penological purposes whatsoever.  In short, because each Defendant personally participated in the events causing constitutional harm to Mr. DePaola, each Defendant is liable for that resulting harm.

## II.    PROCEDURAL BACKGROUND

Mr. DePaola filed this action on October 14, 2016, seeking monetary damages and declaratory and injunctive relief against various VDOC officials. *See* Pl. Compl., ECF No. 1. On March 30, 2018, the Court granted summary judgment in favor of the Defendants on Mr. DePaola's (i) equal protection claim, (ii) facial challenge to the constitutionality of two VDOC operating procedures relating to his punishment for an alleged grooming offense, (iii) claim for monetary damages against the Defendants in their official capacities, and (iv) claims against VDOC officials H. Clarke and A.D. Robinson.  *See* ECF No. 56 at 18.  Mr. DePaola's remaining claims are made pursuant to the First Amendment of the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq.*

As noted above, on March 30, 2018, Judge Jones referred three factual questions to Judge Sargent.  Pursuant to that Order, on October 16-17, 2018, Judge Sargent conducted a two-day evidentiary trial.  *See* ECF Nos. 120, 122.  On February 5, 2019, Judge Sargent issued her Report and Recommendation, in which she recommended that the Court find in favor of the Defendants on Mr. DePaola's remaining claims.  *See* ECF No. 137.  Because Judge Sargent found in the Defendants' favor on the first factual question in the Court's March 30, 2018 Order, she never reaches or addresses the second or third factual questions.

## III.    STANDARD OF REVIEW

This Court conducts a *de novo* determination of any portion of the Report and Recommendation to which objections are made.  28 U.S.C. § 636(b)(1)(C).  Under *de novo* review, the Court must consider any issue to which proper objection is made "as if it had not

been decided previously." *U.S. v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992). The Court's review is not limited to arguments on issues that were raised before Judge Sargent. *Id.* Instead, the Court considers "any argument as to that issue that [] could have [been] raised before the magistrate." *Id.*

## IV.    OBJECTIONS TO FACTUAL FINDINGS

The documents and testimony presented at trial confirm the relevant facts presented to the Court on summary judgment. Specifically, during the relevant time, Mr. DePaola was housed as a segregation inmate in the C-5 residence pod at Red Onion State Prison, and spent over a year working his way up the IM pathway within the VDOC Step-Down Program. *See* ECF No. 130, 21:3-22; ECF No. 121-1, PX-8 (Mr. DePaola's IM status chart). Mr. DePaola is a practicing Muslim, who must maintain facial hair, and who attempts to comply with the relevant VDOC and Red Onion grooming policies, which in 2015 restricted maximum facial hair length to 1/4-inch. *See* ECF No. 130, 34:23-35:12, 35:22-36:5; ECF No. 121-14, PX-68 at 3 (VDOC O.P. 864.1 – Offender Grooming and Hygiene). The applicable 2015 VDOC grooming policy mandated that "facilities should ensure that adequate hair care or barbering services are accessible to all offenders, regardless of housing status, so that they are able to maintain compliance with the grooming standards." *See* ECF No. 130, 198:6-11; ECF No. 121-14, PX-68 at 3-4.

Nevertheless, Red Onion officials, including the Defendants, did not ensure that such services were available in Mr. DePaola's residence pod for the months leading up to November 3, 2015, even though the Defendants made weekly or in some cases daily visits to the pod. *See* ECF No. 130, 152:21-153:14 (Barksdale), 184:13-23 (Gallihar), 235:21-236:7 (Still), 248:17-22 (Lyall), 273:23-274:7 (Fleming); October 17, 2018 Trial Transcript, ECF No. 132, 4:20-5:1 (Stanley), 49:12-13 (Swiney), 96:16-97:1 (Duncan). In fact, VDOC records establish that no

barber was hired for the C-5 residence pod from April 27, 2015 through December 13, 2015. *See* ECF No. 121-16, PX-121 (Inmate Barber Employment Record); ECF No. 130, 192:15-18.

Despite the lack of barber services, the Defendants authorized and carried out a reduction in Mr. DePaola's IM status on November 3, 2015 (which substantially burdened Mr. DePaola's exercise of his Muslim faith), due to his alleged non-compliance with the VDOC grooming policy that the Defendants had previously failed to enforce. *See* ECF No. 130, 49:10-50:12; ECF No. 121-4, PX-35 (Nov. 3, 2015 Disciplinary Offense Report). The Defendants did not discuss the IM status change with Mr. DePaola, and did not give him an opportunity to see a barber before adjusting his IM status and carrying out the resulting punishment. *See* ECF No. 130, 51:11-19, 94:22-95:3, 248:23-249:10, 252:9-19, 255:1-3; ECF No. 132, 224:15-225:1. One form of punishment that the Defendants carried out pursuant to the VDOC Step-Down Policy—before providing Mr. DePaola with a barber—was to remove his personal TV from his cell. *See* ECF No. 130, 248:23-249:10, 252:9-19, 255:1-3. Because there were no other functioning TVs in the C building residence pods in 2015, confiscation of Mr. DePaola's TV had the effect of barring Mr. DePaola from observing Muslim Jum'ah services. *See* ECF No. 132, 80:17-81:3.

On November 11, 2015, Mr. DePaola was again instructed to remove his facial hair when he went to shower (despite his religious objections); and using a safety razor, Mr. DePaola shaved his beard off completely. *See* ECF No. 130, 70:13-71:7. Despite this, and despite the official VDOC grooming charge being dropped, Mr. DePaola's IM status was not changed back, and his TV was not returned for another six months. *See* ECF No. 121-6, PX-24 (Nov. 6, 2015 Informal Complaint); ECF No. 121-7, PX-18 (Nov. 5, 2015 Regular Grievance); ECF No. 121-8, PX-23 (Nov. 11, 2015 Regular Grievance); ECF No. 121-9, PX-36 (Nov. 15, 2015 Offender Request); ECF No. 121-10, PX-17 (Dec. 28, 2015 Informal Complaint); ECF No. 121-11, PX-26 (Jan. 14, 2016 Informal Complaint); ECF No. 121-12,

PX-29 (Dec. 28, 2015 Grievance Report Receipt); ECF No. 121-13, PX-32 (Apr. 4, 2016 Informal Complaint); ECF No. 130, 72:3-5.

Thus, the documents and testimony presented at trial established that the Defendants "faile[ed] to provide barber services . . . or did not prevent or correct such failure" in 2015. *See* ECF No 56 at 18. Indeed, not only did the Defendants fail to prevent or to correct the failure to provide barber services, the trial established that the Defendants punished Mr. DePaola for the consequences of their failures, thereby compounding the harm.

In addition, as shown below, documents and testimony presented at trial established that each of the Defendants had personal knowledge or involvement in the actions that led to Mr. DePaola's lack of access to a barber and resulting unconstitutional punishment.

## A. Defendant Lyall Failed to Provide Mr. DePaola with Access to Barber Services

Contrary to the Report and Recommendation's conclusion that the Defendants did not "purposefully deny" Mr. DePaola barbers services, *see* ECF No. 137 at 29, the facts show that at least one Defendant, Lyall, did just that. On November 3, 2015, Defendant Lyall was the Building Lieutenant in charge of security for C building, and he had been ordered by other Defendants to demote Mr. DePaola's IM status and confiscate his TV. *See* ECF No. 130, 249:3-10, 252:12-16; ECF No. 132, 224:12-225:1.

When Defendant Lyall went to Mr. DePaola's cell that day to inform him of his IM status reduction and grooming violation, it is undisputed that Mr. DePaola told Defendant Lyall that Mr. DePaola's religion did not allow him to shave. *See* ECF No. 137 at 20. According to Mr. DePaola, he then informed Defendant Lyall that he needed barber services to maintain a beard, and Defendant Lyall responded "there is no barber":

Q. But my question to you is when Lieutenant Lyall said to you, "Are you going to come into compliance with grooming policy –

A [Mr. DePaola]. He never said that.

Q. When he indicated you were out of compliance with the grooming policy, did you say, I would like barber services?

A. I told him I needed, you know, barber services.

Q. So it's your testimony that you asked for barber services and Lieutenant Lyall denied those to you.

A. He said there was no barber. He said there was – he didn't say I'm not giving you a barber. He said there is no barber.

Q. And that was the only reason that he gave for not giving barber services to you.

A. Correct.

ECF No. 130, 106:19-107:8; *see also id*. at 252:9-11 (Defendant Lyall admitting Mr. DePaola was not permitted the opportunity to trim). While Defendant Lyall denied he said that, contemporaneous VDOC records corroborated that no barber was employed in the C-5 pod at Red Onion from April 27, 2017 to December 13, 2015. ECF No. 137 at 14; ECF No. 121-16, PX-121; ECF No. 130, 192:15-18.

Nevertheless, even if Defendant Lyall did not respond as Mr. DePaola testified, and Defendants Lyall's trial testimony was accurate that Defendants Lyall never "disrespected" Mr. DePaola's religious views, *see* ECF No. 137 at 20, Defendant Lyall testified that he construed Mr. DePaola's statement that he was a Muslim and could not shave to be "a refusal to comply" with the VDOC grooming policy. *See* ECF No. 137 at 20; *see also* ECF No. 130, 249:3-6, 251:22-252:11, 253:5-21, 264:17-25. The Report and Recommendation makes this same mistake. *See* ECF No. 137 at 31. Of course, explaining that he cannot shave with a safety razor (because doing so would force him to shave his beard off completely) is not a refusal to comply with the VDOC grooming policy, much less a justification for severe punishment; it is simply Mr. DePaola asking to be allowed to trim his beard in order to comply with his religious obligations as a Muslim. (In fact, as noted above, Mr. DePaola testified that he strives to comply with the VDOC grooming policy by trimming, not shaving.) That there had been no barber services in the C-5 pod for months leading up to November 3, 2015, was not Mr.

DePaola's fault, and the VDOC grooming policy itself requires that barber services be made available to inmates so that they may remain in compliance. *See* ECF No. 121-14, PX-68 at 3.

Defendant Lyall had the ability—and the obligation under VDOC policies—to make barber services available to Mr. DePaola before punishing him, but Defendant Lyall did not. *See* ECF No. 130, 106:23-107:8, 252:9-11. Therefore, Defendant Lyall "fail[ed] to provide barber services to [Mr. DePaola] in 2015," and Defendant Lyall's actions directly caused Mr. DePaola's unconstitutional quandary and substantially burdened Mr. DePaola's exercise of his sincerely held religious beliefs. *See* ECF No. 56 at 18.

### B. The Other Defendants Did Not Prevent or Correct the Failure to Provide Mr. DePaola with Access to Barber Services

The Report and Recommendation largely ignores the second part of the first question that Judge Jones referred to Judge Sargent: whether any Defendant "did not prevent or correct [the] failure" to provide barber services, and "thereby prevented DePaola from adhering to sincerely held religious beliefs." *See* ECF No. 56 at 18-19.

In November 2015, Defendant Barksdale was Red Onion's warden, Defendant Gallihar was the Chief of Housing and Programs ("CHAP"), Defendants Swiney and Still were the acting Unit Mangers of C Building, and Defendant Duncan was Mr. DePaola's counselor. ECF No. 130, 183:24-184:1, 185:9-186:2, 245:21-246:1; ECF No. 132, 67:18-19. Documents and testimony proffered at trial establish that Defendant Barksdale was ultimately "responsible for monitoring compliance" with the VDOC grooming policy, and ensuring that "offenders that appear to be out of compliance, [were] required to trim to come into compliance." *See* ECF No. 121-14, PX-68 at 3; ECF No. 130, 194:9-21. There is no dispute that Defendant Barksdale did not do so here. The documents and testimony presented at trial also established that Defendants Gallihar, Swiney, Still, and Duncan were each personally involved in the decision to adjust Mr. DePaola's status to IM-0 due to his grooming violation—even though Mr. DePaola had not been offered a barber nor charged with a grooming violation when those

Defendants made that adjustment decision. *See* ECF No. 121-17, PX-57 (O.P. 830.A – Segregation Reduction Step-Down Program) at 4-5; ECF No. 130, 183:24-184:1, 185:9-186:2, 245:21-246:1; ECF No. 132, 67:18-19, 223:25-224:5, 224:12-225:1. The evidence offered at trial also established that Defendants Fleming and Stanley were the correctional officers who accompanied Defendant Lyall to Mr. DePaola's cell and carried out the punishments, including seizing Mr. DePaola's TV. *See* ECF No. 121-5, PX-21; ECF No. 130, 256:4-7.

Thus, even assuming that the Defendants' self-serving responses to leading questions from their own counsel were accurate and that the Defendants did not "purposefully deny" Mr. DePaola barber services,[1] contrary to the Report and Recommendation's conclusions, each of the other Defendants was personally involved in a failure to "prevent or correct" the undisputed lack of regular barber services in C-5 residence pod, and personally involved in carrying out Mr. DePaola's unconstitutional punishment. *See* ECF No. 56 at 18.

### C. Mr. DePaola Did Not Receive Barber Services, and Any Additional Requests Would Not Have Precluded Punishment

Judge Sargent's recommendation that the Court find in the Defendants' favor is based on her conclusion that Mr. DePaola would have been provided barber services if he had asked for them. *See* ECF No. 137 at 31 ("More importantly, both Lyall and Still testified that, if DePaola had agreed to comply with the grooming policy on November 3, 2015, they would have arranged for him to receive barber services."). Of course, Mr. DePaola testified that he *did* ask for barber services and that he never refused to comply with the grooming policy—Mr. DePaola merely told Defendant Lyall that he could not *shave* due to religious obligations.

---

[1] Judge Sargent allowed the Defendants' own lawyers to ask plainly leading questions because Mr. DePaola called the Defendants in his case in chief, and the Defendants' counsel thus were conducting cross-examinations, albeit of their own clients. *See, e.g.*, ECF No. 130, 176:10-177:8; *see also id.*, 240:1-5 (Still) ("Q. Okay. Did you ever at any time in, let's say, October of 2015 through February 2016, did you at any time tell the line officers that report to you to not deliver barber services? A. No, sir.").

Thus, the record does not support the Report and Recommendation's conclusion that barber services would have been provided to Mr. DePaola if he had made additional requests.

The testimony relied on by Judge Sargent to make this conclusion as to Defendant Lyall is equivocal—i.e., "if possible"—even though it comes in response to a plainly leading question by Defendant Lyall's own lawyer:

> Q. If [DePaola] had wanted barber services, would you have then put him on the list and arranged for the barber to trim his beard?
>
> A. [Defendant Lyall].  Yes.  If possible, I would have.

*See* ECF No. 130, 261:22-24.  This does not establish that Defendant Lyall would have made barber services available to Mr. DePaola if Mr. DePaola had asked, particularly as there was no barber employed in the C-5 pod at that time, making the possibility dubious (and perhaps explaining Defendant Lyall's equivocation).  Indeed, merely adding Mr. DePaola to a "list" likely would have resulted in Mr. DePaola *not* receiving barber services in sufficient time to make a difference with respect to the punishment under the VDOC Step-Down Program that Mr. Lyall was enforcing that very day.  *See* ECF No. 137 at 31.

Nor does Defendant Still's testimony support the Report and Recommendation's conclusion.  During the first day of testimony, Defendant Still essentially confirmed Mr. DePaola's version of events that neither Defendant Lyall nor anyone else provided Mr. DePaola with an opportunity to see a barber on November 3, 2015, before the Defendants summarily punished him:

> Q. And if an order was to be given for the inmate to get in compliance, what would you expect the procedure to be, vis-a-vis that officer and inmate?
>
> A. I would expect either an officer or supervisor to go to the door and say you need to come out today, you need a shower and shave, you need to get in compliance.
>
> Q. And if the inmate responded, no, I won't, what would the officer do at that point?
>
> A. Then we would go ahead and probably write a disciplinary charge.

*See* ECF No. 130, 240:19-241:3. Thus, presumably, the Report and Recommendation relies on Defendant Still's completely revised version of events that Defendants Still offered in response to his counsel's questions the very next day, when the Defendants called him as their only witness:

> Q. And I believe Lieutenant Lyall had said that he was directed by you to go to, among others, Mr. DePaola's cell.
>
> A. Yes.
>
> Q. What sort of directions do you recall giving to Lieutenant Lyall?
>
> A. Go up there and get the TV. If they want to comply, just let me know, we'll get them a barber.

*See* ECF No. 132, 221:17-23.

That Defendant Still's revised, self-serving testimony would be credited is surprising. During cross-examination, Defendant Still admitted that he only remembered this new version of events while he was sitting in the courtroom, and did not provide it in response to counsel's questions at his deposition just a few weeks before:

> Q. Mr. Still, when did all these memories that you just testified about, when did those come back to you?
>
> A. During the past two days, all this testimony I've heard. After we did the deposition, after I had a chance to gather my thoughts, you know, I sat down and thought about what went on.

*See* ECF No. 132, 222:17-223:23. In addition, Defendant Still's revised version conflicts with that of Defendant Lyall, who never testified that Defendant Still instructed him to offer barber services to Mr. DePaola. *See* ECF No. 130, 249:3-10. To the contrary, Defendant Lyall testified that he did *not* provide Mr. DePaola with the opportunity to have his beard trimmed with clippers before writing the disciplinary charge. *See* ECF No. 130, 252:9-11, 264:21-23.

In fact, the Defendants had already made the decision to reduce Mr. DePaola's IM status and seize his TV *before* Defendant Lyall ever arrived at Mr. DePaola's cell—a decision that the Defendants conceded could neither be challenged nor reversed by an inmate—and

Defendants Still and Lyall never intended to offer Mr. DePaola barber services to comply with the VDOC grooming policy before carrying out the punishment. ECF No. 130, 53:23-54:1, 248:23-249:5, 253:5-12; ECF No. 132, 92:24-93:1; ECF No. 121-6, PX-24. Defendant Still testified that he did not have the ability to change an inmate's IM status, so clearly he could not have promoted Mr. DePaola's IM status even if Mr. DePaola had trimmed his beard that very day. ECF No. 132, 224:18-20. Nor did Defendant Lyall provide Mr. DePaola with a reason for the status change when Defendant Lyall went to Mr. DePaola's cell. ECF No. 130, 248:23-249:10, 252:9-19, 255:1-3. He simply informed Mr. DePaola of the IM status reduction, interpreted Mr. DePaola's religious objection to shaving as a refusal to obey his order, and wrote him a VDOC disciplinary charge. ECF No. 130, 249:3-6, 251:22-252:11, 253:5-21, 264:17-25. According to Defendant Lyall, he was doing "status reductions" and "the charge was a separate issue from there." ECF No. 130, 265:21-22.

Thus, contrary to the Report and Recommendation's conclusion, even if Mr. DePaola had trimmed his beard to comply with the VDOC grooming policy on November 3, 2015—which Mr. DePaola was never given the chance to do—Mr. DePaola still would have suffered the exact same unconstitutional punishments under the VDOC Step-Down Program, including loss of his ability to observe Muslim Jum'ah services. ECF No. 121-1, PX-8; ECF No. 132, 80:18-81:19, 94:13-95:1; ECF No. 137 at 23.

## V. OBJECTIONS TO LEGAL CONCLUSIONS

The Report and Recommendation incorrectly concluded that the Defendants' "actions in enforcing the grooming policy did not substantially burden DePaola's rights to freely exercise his religious beliefs" because the Defendants did not "purposefully den[y]" Mr. DePaola barber services, and "barber services would have been made available to allow DePaola to comply with the grooming policy" if Mr. DePaola had asked, which the Report and Recommendation assumes Mr. DePaola did not. *See* ECF No. 137 at 29, 31. As set forth

above, these conclusions are unsupported by the facts. These conclusions also are unsupported by the law.

The Report and Recommendation assumes that the Defendants could only be liable for the "purposeful" denial of services to Mr. DePaola. *See* ECF No. 137 at 29. Judge Sargent does not explain the "purposeful" standard she imposes, nor does she cite to any case explaining such a standard. In any event, the evidence at trial established that (i) Defendants had a duty to ensure compliance with the VDOC grooming policy;[2] (ii) Defendants necessarily knew that Mr. DePaola (and others) were not being provided grooming services as required by the VDOC grooming policy;[3] (iii) yet Defendants neither prevented nor corrected that failure before punishing Mr. DePaola. *See, e.g.*, ECF No. 130, 251:10-252:11 (Lyall) ("Q: And as far as you know, Mr. DePaola was not given the opportunity to have his beard trimmed with clippers. A: At the time of the charge, no."). These facts, taken together, establish that the Defendants acted personally and purposefully (if that were the correct legal standard).

In any event, the standard for liability under Section 1983 requires only that the Defendants have acted personally, i.e., that the Defendants had personal knowledge of and involvement in the deprivation of Mr. DePaola's constitutional rights. *See Cravey*, 2018 U.S. Dist. LEXIS 158890, at *24. In other words, Defendants' liability under Section 1983 does not depend on establishing that the Defendants intentionally violated Mr. DePaola's rights; only that the Defendants "had personal knowledge of and involvement in" the failure to provide Mr. DePaola barber services, or did not prevent or correct such failure, which led to the deprivation of Mr. DePaola's rights. *See id.* The evidence presented at trial confirms that this standard is met here.

---

[2] *See* ECF No. 121-4, PX 68 at 2; ECF No. 130, 155:8-11 (Barksdale), 184:24-1 (Gallihar), 234:18-21 (Still), 246:2-5 (Lyall), 274:11-21 (Fleming); ECF No. 132, 5:25-6:7 (Stanley); 42:14-20 (Swiney); 74:6-10 (Duncan).

[3] *See* ECF No. 130, 152:21-153:14 (Barksdale), 184:13-23 (Gallihar), 235:21-236:7 (Still), 248:17-22 (Lyall), 273:23-274:7 (Fleming); October 17, 2018 Trial Transcript, ECF No. 132, 4:20-5:1 (Stanley), 49:12-13 (Swiney), 96:16-97:1 (Duncan).

The Report and Recommendation also fails to acknowledge that the Defendants may be liable under Section 1983 as supervisors or bystanders. A defendant can be liable as a supervisor under Section 1983 if (i) the defendant had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates like Mr. DePaola; (ii) the defendant's response to such knowledge was sufficiently inadequate to amount to deliberate indifference to or tacit authorization of the conduct; and (iii) there was a causal link between the defendant's inaction and Mr. DePaola's constitutional injury. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). A defendant can be liable as a bystander under Section 1983 if (i) the defendant knew that a fellow correctional officer was violating Mr. DePaola's constitutional rights, (ii) the defendant had a reasonable opportunity to prevent the harm, but (iii) the defendant chose not to act. *See Randall v. Prince George's Cty.*, 302 F. 3d, 188, 204 (4th Cir. 2002).

## A. Each Defendant Is Liable Under Section 1983

**Defendant Earl Barksdale**: As Red Onion's warden in 2015, Defendant Barksdale is liable under Section 1983 for deprivation of Mr. DePaola's First Amendment rights at least because his subordinates—including all the other Defendants—acted pursuant to official Red Onion policies and procedures for which Defendant Barksdale was responsible. For example, the VDOC Step-Down Program provides that Defendant Barksdale was ultimately responsible for security level changes for inmates at Red Onion in November 2015, and VDOC grooming policies in place in November 2015 provide that Defendant Barksdale was "responsible for monitoring compliance, and offenders that appear to be out of compliance, will be required to trim to come into compliance." *See* ECF No. 121-14, PX-68 at 3; *see also* ECF No. 133-1, PX-200 at 10 (2015 Step-Down Plan); ECF No. 121-17, PX-57 at 6.

Defendant Barksdale therefore meets each of the factors for establishing his liability as a supervisor under Section 1983. First, Defendant Barksdale had knowledge that the inmates

in the C-5 residence pod including Mr. DePaola were out of compliance with the policy because Defendant Barksdale testified that he regularly made the rounds of the residence pods once a week, including looking in cells at each inmate. *See* ECF No. 130, 152:21-153:14. Because barber services had not been provided in C-5 residence pod for months before November 2015, and more than one inmate was apparently out of compliance, Defendant Barksdale had multiple opportunities to direct his subordinates to provide barber services to the inmates in the C-5 residence pod, including Muslim inmates such as Mr. DePaola, who were out of compliance with the VDOC beard length requirements. *See Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) ("Establishing a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury.").

Despite necessarily having observed inmates in the C-5 residence pod such as Mr. DePaola out of compliance with the VDOC grooming policy, Defendant Barksdale did nothing, even though he easily could have directed his subordinates to allow C-5 residence pod inmates including Mr. DePaola an opportunity to trim their beards during the months preceding Mr. DePaola's grooming charge. Indeed, ensuring the availability of barber services was Defendant Barksdale's personal responsibility under the VDOC grooming policy. *See Reid v. Clarke*, No. 16-cv-547, 2018 U.S. Dist. LEXIS 126722, at *15-17 (W.D. Va. Jul. 30, 2018) (denying summary judgment on issue of supervisor's liability because supervisor knew plaintiff had a medical condition, but "did not order or ensure that Plaintiff receive medical treatment, standing by while his subordinate [] drafted and applied a medically deficient policy.").

Additionally, Defendant Barksdale's failure to ensure that adequate barber services were provided in the C-5 residence pod on a monthly basis—required under VDOC and Red

Onion policies—led directly to Mr. DePaola's unconstitutional punishment. *See Wilkins*, 751 F.3d at 226-27 ("proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions."); *Clarke*, 2018 U.S. Dist. LEXIS 126722, at *17 (finding causation may be inferred where supervisor's denials of treatment "were a function of the policy that [his] subordinate had created and (already once incorrectly) implemented").

**Defendant Arvil Gallihar**: As the CHAP and member of the Dual Treatment Team and Building Management Committee, Defendant Gallihar had personal knowledge of and involvement in the decision to punish Mr. DePaola by adjusting his status to IM-0 on November 3, 2015, instead of choosing reasonable alternatives. *See* ECF No. 121-17, PX-57 at 5; ECF No. 133-1, PX-200 at 12; ECF No. 132, 30:19-31:4, 33:24-34:7, 224:12-225:1. As acting Unit Managers of the C building, Defendants Swiney and Still both reported to Defendant Gallihar, and according to Defendant Still, Defendant Still would have informed Defendant Gallihar that Mr. DePaola was out of compliance with the grooming policy. Moreover, Defendant Still testified that Defendants Gallihar and Swiney informed him of the decision to change Mr. DePaola's status to IM-0. *See id*. Thus, the only inference from the available testimony is that Defendant Gallihar was personally involved in making the decision to demote Mr. DePaola's status to IM-0, and his actions and inactions directly caused Mr. DePaola's constitutional violations.

Even if Defendant Gallihar did not have personal involvement in that decision (which he did), he is also liable under a theory of supervisory liability for the same reasons as Defendant Barksdale. Like Defendant Barksdale, Defendant Gallihar had actual knowledge that Mr. DePaola was out of compliance with the policy because he made regular rounds of the C-5 residence pod, looked in each cell, and indeed Defendant Still testified that he would have

informed Defendant Gallihar of Mr. DePaola's lack of compliance. *See* ECF No. 130, 184:13-23; *see also* ECF No. 132, 223:25-224:5; *Wilkins*, 751 F.3d at 226. Instead of directing his subordinates in C building to provide barber services, however, Defendant Gallihar authorized Mr. DePaola's demotion to IM-0, and removal of Mr. DePaola's TV. *See* ECF No. 132, 224:12-225:1; *see also Clarke*, 2018 U.S. Dist. LEXIS 126722, at *16-17. Thus, not only was Defendant Gallihar indifferent to his subordinates' failures to provide adequate barber services to Mr. DePaola, he directly participated in causing Mr. DePaola's constitutional violation by making and implementing the decisions under the Step-Down Program that led to Mr. DePaola's failure to observe Jum'ah for six months. *See Clarke*, 2018 U.S. Dist. LEXIS 126722, at *17.

**Defendant Walter Swiney**: As the acting Unit Manager of C building in charge of classifications, and a member of the Dual Treatment Team and Building Management Committee, Defendant Swiney was the person most directly responsible for the decision to punish Mr. DePaola by adjusting Mr. DePaola's status to IM-0 on November 3, 2015, instead of choosing reasonable alternatives. *See* ECF No. 130, 51:11-19, 94:22-95:3, 248:23-249:13; 252:9-19, 255:1-3; ECF No. 132, 39:15-41:2, 41:14-23, 42:14-20; 220:14-16, 224:15-225:1; *see also* ECF No. 121-1, PX-8. According to Defendant Swiney, the reason he authorized the status change to IM-0 was that Mr. DePaola refused an order to comply with the VDOC grooming policy. But that was not true. The record shows that Mr. DePaola had not even been offered the opportunity to see a barber at that point, and Defendant Swiney never provided such an opportunity before implementing severe punishment under the Step-Down Program, including the confiscation of Mr. DePaola's TV. *See* ECF No. 121-14, PX-68 at 3-4; ECF No. 130, 49:10-50:12, 51:11-19, 94:22-95:3, 248:23-249:13, 252:9-19, 255:1-3; ECF No. 132 220:14-16, 224:15-225:1; ECF No. 121-4, PX-35. Thus, Defenant Swiney's actions and inactions directly caused Mr. DePaola's constitutional violation.

**Defendant David Still**:  As the other acting Unit Manager of C building in charge of classifications, and a member of the Dual Treatment Team and Building Management Committee, Defendant Still also had personal knowledge of and involvement in the decision to punish Mr. DePaola by adjusting his status to IM-0 on November 3, 2015, instead of choosing reasonable alternatives.  *See* ECF No. 130, 235:14-16; ECF No. 132, 52:25-53:3, 223:25-224:5, 224:12-225:1.

According to Defendant Still, he was the person who first identified that many inmates in the C building were out of compliance with the grooming policy, and would have informed Defendants Gallihar and Swiney.  *See* ECF No. 223:25-224:5.  Defendant Still, however, did not ensure that barber service were provided to those inmates in the C building who were out of compliance, which was an easy available alternative.  Instead, Defendant Still instructed his subordinates in the building to carry out punishment, including removing Mr. DePaola's TV, without ensuring that inmates such as Mr. DePaola (who might have had religious objections to shaving) had an opportunity to see a barber.  *See* ECF No. 130, 235:14-16; ECF No. 132, 52:25-53:3, 224:12-225:1.  Thus, Defendant Still's actions and inactions directly caused Mr. DePaola's constitutional violations.

**Defendant Amee Duncan**:  As Mr. DePaola's counselor and member of the Dual Treatment Team and Building Management Committee, Defendant Duncan had personal knowledge of and involvement in the decision to punish Mr. DePaola by adjusting his status to IM-0 on November 3, 2015, instead of choosing reasonable alternatives.  *See* ECF No. 133-1, PX-200 at 10-11; ECF No. 121-17, PX-57 at 1; ECF No. 132, 30:19-31:4, 33:24-34:7, 67:18-19.  Indeed, Defendant Duncan had almost daily contact with Mr. DePaola during this time, *see* ECF No. 132, 96:16-97:1, and therefore was perhaps the best placed VDOC employee to seek implementation of any of the reasonable alternatives available at the time, such as ensuring barber services were made available to Mr. DePaola.  Not only did Defendant Duncan do

nothing to ensure the availability of barber services, but according to the Step-Down Program, she would have authorized the decision to demote Mr. DePaola to IM-0 status. *See* ECF No. 133-1, PX-200 at 10-11; ECF No. 121-17, PX-57 at 1; ECF No. 132, 30:19-31:4, 33:24-34:7. Thus, Defendant Duncan's actions and inactions directly caused Mr. DePaola's constitutional violations.

**Defendant James Lyall**: As explained above, Defendant Lyall personally denied barber services to Mr. DePaola, and drafted the VDOC disciplinary charge that presumably served as a basis for adjusting Mr. DePaola's IM status to IM-0. *See* ECF No. 130, 106:23-107:8, 252:9-11. Indeed, Mr. DePaola expressly told Defendant Lyall that he had a religious objection to shaving his face with a razor, which Defendant Lyall wrongly construed as a refusal to comply with the VDOC grooming policy. Defendant Lyall did nothing to accommodate Mr. DePaola's objection, and failed to provide Mr. DePaola with the opportunity to see a barber as required under the VDOC policy before writing him a disciplinary charge. *See* ECF No. 130, 106:23-107:8, 252:9-11. Defendant Lyall ordered two correctional officers to confiscate Mr. DePaola's TV, which caused Mr. DePaola's inability to observe Jum'ah. *See* ECF No. 130, 256:4-7; ECF No. 121-5, PX-21; ECF No. 132, 80:17-81:3. Defendant Lyall also later instructed Mr. DePaola to remove his facial hair, again without providing Mr. DePaola the opportunity to see a barber, which led to Mr. DePaola shaving his face with a razor. *See* ECF No. 130, 70:13-71:7. Thus, Defendant Lyall's actions and inactions directly caused Mr. DePaola's constitutional violations.

**Defendants John Fleming and Ronald Stanley**: Defendants Fleming and Stanley both regularly made rounds in the C Building in the months preceding November 2015 and would have observed the length of Mr. DePaola's beard well in advance of November 3, 2015. *See* ECF No. 130, 273:23-274:7; ECF No. 132, 49:12-13. However, even though they were aware that Mr. DePaola had gone months without shaving and that Mr. DePaola had a religious

objection to shaving, Mr. Fleming and Mr. Stanley immediately followed Defendant Lyall's unconstitutional order. *See* ECF No. 130, 256:4-7; ECF No. 121-5, PX-21. Without questioning Defendant Lyall, Defendants Fleming and Stanley entered Mr. DePaola's cell, shackled Mr. DePaola, and removed his TV and coaxial cable. *See id*.

Defendants Fleming and Stanley therefore meet the requirements for being liable as a bystander under Section 1983. First, because Defendants Fleming and Stanley were aware or should have been aware that Mr. DePaola grew a beard for religious purposes, and they had knowledge that Mr. DePaola was being punished in a way that substantially burdened his religious beliefs. *See id.*; *Randall*, 302 F. 3d at 204; *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981) (determining that defendant simply following a superior's orders could be liable if he "knew or should have known that he was violating plaintiffs' constitutional rights"). Defendants Fleming and Stanley could have prevented Mr. DePaola's constitutional violation by not removing his TV, or by seeking to make available alternatives to Mr. DePaola, such as providing a barber, but chose not to do so. *See Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) ("[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order.") (quoting *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004)). Because Mr. DePaola's only way to observe Jum'ah was through his TV, Defendant Fleming and Defendant Stanley's actions and inactions directly caused Mr. DePaola's constitutional violations.

### B. Each Defendant Is Also Liable Under RLUIPA

RLUIPA prohibits prison officials from imposing a "substantial burden on an inmate's religious exercise unless prison officials can demonstrate that the burden furthers a compelling governmental interest by the least restrictive means." *Miles v. Moore*, 450 F. App'x 318, 319 (4th Cir. 2011) (unpublished). A "substantial burden" under RLUIPA occurs when a policy as

applied "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, [] or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted); *see also* ECF No. 35 at 11-13. The test under RLUIPA is stricter than the "reasonableness" test used for analyzing First Amendment violations. *See Lovelace*, 472 F.3d at 186 (RLUIPA demands "a more searching standard of review . . . than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness"). Once a plaintiff demonstrates that an action substantially burdens his religious practice, RLUIPA requires the defendants "not merely to explain why" they took such action, but to prove that taking such action was "the least restrictive means of furthering a compelling governmental interest." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) ("Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise. But that respect does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard.").

As explained above, Mr. DePaola is a practicing Muslim who sincerely believes that he should maintain facial hair and observe Jum'ah to the extent possible while he remains incarcerated at Red Onion, and the Defendants' actions substantially burdened Mr. DePaola's free exercise in at least two ways. *See* ECF No. 130, 34:23-35:12, 35:22-36:5, 36:20-37:3, 37:22-38:4, 38:16-39:17, 39:1-8; ECF No. 121-2, PX-103 (requesting and receiving non-pork diet). First, Mr. DePaola was not provided barber services sufficient for him to maintain facial hair and comply with the applicable VDOC grooming policy, which forced him to choose between shaving his face completely or suffering severe punishment. *See* ECF No. 130, 48:14-49:9, 92:2-11231:8-20; ECF No. 132, 43:16-23. Second, the severe forms of punishment applied under the Step-Down Program also substantially burdened Mr. DePaola's faith because

they prohibited him from observing Jum'ah for at least six months.  *See* ECF No. 130, 39:9-17, 40:1-8, 40:24-2; ECF No. 132, 80:17-24

Here, the Defendants offered *no* penological interests served by their failure to provide barber services or their punishment of Mr. DePaola, much less any compelling governmental interest.  *See Brown v. Ray*, 695 F. Supp. 2d 292, 303 (W.D. Va. 2010) (requiring that defendants provide a "substantive, relevant explanation" in order to demonstrate that the relevant policy is the "least restrictive means of furthering the interest of prison security and offender rehabilitation").  The only expert witness in this case, John Clark, opined that enforcing such punishment without due process—which the Defendants conceded was the case here—undermined any legitimate penological bases of the Step-Down Program.  *See* ECF No. 132, 166:15-22, 170:8-172:8, 179:4-13.  Even if such a compelling governmental interest existed, far less restrictive means also existed for achieving such an interest, including offering barber services to Mr. DePaola before adjusting his IM status or carrying out the seizure of his TV.

Therefore, under a strict scrutiny test, the Defendants' actions also clearly constituted a violation of RLUIPA.

## VI.    THE COURT SHOULD ADOPT MR. DEPOLA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On November 28, 2018, Mr. DePaola filed his Proposed Findings of Fact and Conclusions of Law addressing all three factual questions referred to Judge Sargent for resolution.  *See* ECF No. 135.  No Defendant filed any responses or alternative findings or conclusions.  As noted above, the Report and Recommendation does not reach or address the second or third factual questions due to its conclusion on the first question.  Mr. DePaola hereby incorporates by reference his Proposed Findings of Fact and Conclusions of Law and respectfully submits that the Court should adopt them.

## VII. CONCLUSION

For the foregoing reasons, and those stated in Mr. DePaola's Proposed Findings of Fact and Conclusions of Law, Mr. DePaola respectfully requests that the Court sustain his objections, decline to adopt the Judge Sargent's incorrect conclusions, and find in his favor on his remaining claims.

Dated: February 19, 2019               Respectfully Submitted,

*/s/ Jaime M. Crowe*
Jaime M. Crowe (VSB No. 37186)
James P. Gagen (Pro Hac Vice)
Nicholas P. Putz (Pro Hac Vice)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Main: (202) 626-3640
Mobile: (202) 258-5930
Facsimile: (202) 639-9355
Email: jcrowe@whitecase.com
Email: jgagen@whitecase.com
Email: nicholas.putz@whitecase.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will automatically send e-mail

notification of such filing to all counsel of record in this matter.

*/s/ Jaime M. Crowe*
Jaime M. Crowe (VSB No. 37186)
James P. Gagen (Pro Hac Vice)
Nicholas P. Putz (Pro Hac Vice)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Main: (202) 626-3640
Mobile: (202) 258-5930
Facsimile: (202) 639-9355
Email: jcrowe@whitecase.com
Email: jgagen@whitecase.com
Email: nicholas.putz@whitecase.com

AMERICAS 98665065